868 A.2d 346

AMERICAN FIRE AND CASUALTY COMPANY, PLAINTIFF–
APPELLANT, v. NEW JERSEY DIVISION OF TAXATION,
DEFENDANT–RESPONDENT (TWO CASES).

WEST AMERICAN INSURANCE COMPANY, PLAINTIFF–
APPELLANT, v. NEW JERSEY DIVISION OF TAXATION,
DEFENDANT–RESPONDENT (TWO CASES).

OHIO CASUALTY CO., PLAINTIFF–APPELLANT, v. NEW JERSEY
DIVISION OF TAXATION, DEFENDANT–RESPONDENT.

PRUCO LIFE INSURANCE COMPANY, PLAINTIFF–APPELLANT,
v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT–
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 8, 2004—Decided March 9, 2005.

---

[4] We do not suggest that Peters, or another qualified expert, would not be permitted to testify at a new trial or that CBLA testimony in some form could not be admissible. The trial judge is best suited to make decisions about the proper scope of CBLA evidence if it is proffered again. The judge can conduct a hearing *in limine*, *N.J.R.E.* 104(a), if a dispute arises with respect to such matters.

436

Before Judges FALL, PAYNE * and C.S. FISHER.

*Richard D. Pomp* of the Connecticut bar, admitted pro hac vice, argued the cause for appellants American Fire and Casualty Company, Ohio Casualty Company and West American Insurance Company, (*McDermott, Will & Emery*, attorneys; *Mr. Pomp* and *Margaret C. Wilson*, on the brief).

*Michael A. Guariglia*, argued the cause for appellant Pruco Life Insurance Company (*McCarter & English*, attorneys; *Mr. Guariglia*, of counsel, and *Open Weaver Banks*, on the brief).

*Carol Johnston*, Senior Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Attorney General, attorney; *Michael J. Haas*, Assistant Attorney General, of counsel; *Ms. Johnston*, on the brief).

The opinion of the court was delivered by

PAYNE, J.A.D.

In *American Fire and Casualty Co. v. Director, Div. of Taxation*, 21 *N.J.Tax* 155 (2003), a judge of the Tax Court affirmed, against challenges by foreign domiciled insurers, the methodology utilized by the Director, New Jersey Division of Taxation (Director) for calculating the State's retaliatory insurance tax [1] so as to recapture the benefits to foreign insurers that otherwise would be provided by the State's premium tax cap. The decision, applied in principle in thirteen actions, was appealed in the actions before us, which we decide together. We reverse.

---

[*] Although Judge Payne was not present at oral argument, she listened to the audio recording of the argument before participating in the decision.

[1] This methodology is "not embodied in regulations or a written statement of internal policies." *American Fire, supra*, 21 *N.J.Tax* at 162. In light of our resolution of the issues raised in these appeals, we do not find it necessary to address the challenge by appellant Pruco Life Insurance Company to the Director's actions as violative of the Administrative Procedures Act. *N.J.S.A.* 52:14B-1 to -15.

New Jersey imposes two taxes of relevance to this appeal: a premium tax and a retaliatory tax. The premium tax statute, codified at *N.J.S.A.* 54:18A–1 to –11, requires that all domestic and foreign insurance companies pay an annual tax "based on net premiums on contracts of insurance covering property and risks located within this State written during the calendar year ending December 31 next preceding." *N.J.S.A.* 54:18A–1(a). The tax for non-life insurers is presently set at 2.1% of taxable premiums in this State. *N.J.S.A.* 54:18A–2(a). The same rate applies to life and health insurance companies. *N.J.S.A.* 54:18A–3(a).

However, the premium tax statute contains a premium cap provision, applicable both to property and casualty and to life and health insurers, that is unique to New Jersey. *See N.J.S.A.* 54:18A–6. That statute, enacted in 1945 (*L.* 1945, *c.* 132, § 6) provides in essence that if the premiums collected by a company and its affiliates that are taxable in New Jersey exceed twelve and one-half percent of the "total premiums collected by the company and all of its affiliates during the same year on all policies and contracts of insurance, whenever and wherever issued," then the premiums taxable in New Jersey "shall not exceed" twelve and one-half percent of the company's total premiums. The manifest intent of the cap is to attract capital and "provide[ ] insurance companies with incentive to voluntarily write significant amounts of business in New Jersey." Senate Committee on Labor, Industry and Professions Statement to Senate Bill No. 2395—*L.* 1985, *c.* 294. Because the statute, which creates a tax incentive, is not limited to New Jersey companies, it does not constitute a preference that, as we will explain in Part IV of this opinion, would be constitutionally prohibited on equal protection grounds.

In 1985, when the statute was amended to require that an insurer include not only its own taxable premiums wherever earned, but also those of its affiliates, so as to prevent the recent phenomenon of centralization of New Jersey business in a single New Jersey domiciled affiliate that would technically qualify for

the cap, the true purpose of the statute was expressed in the following terms:

> The limitation on the maximum amount of premium tax payable was intended to be available to those insurance companies, domestic or foreign, which made a substantial commitment to New Jersey and contribution to its economy as evidenced by the percentages of overall business written in this State compared to elsewhere. Typically, insurance companies qualifying for the limitation had significant numbers of New Jersey employees providing service to policyholders and claimants residing here, paid substantial sums of real property taxes, maintained deposits in local banks, invested considerable funds in local securities and companies and generally contributed to the economy by utilizing other local services and businesses.
>
> [*Ibid.*]

New Jersey's retaliatory tax, enacted in 1950 and codified at *N.J.S.A.* 17:32–15, has a wholly different purpose. That statute, stripped to its essentials, provides:

> When by the laws of any other state ... any premium or income or other taxes ... are imposed upon New Jersey insurance companies ... doing business in such other state ... which are in excess of such taxes ... imposed upon insurance companies ... of such other state ... doing business in New Jersey ... so long as such laws continue in force the same premium or income or other taxes ... shall be imposed upon insurance companies ... of such other state ... doing business in New Jersey.[2]

This retaliatory tax applies solely to foreign (out-of-state) or alien (out-of-U.S.) insurers.

Although the manner of implementation of the statute is not entirely clear from its language, what the statute in effect is intended to do is to permit the imposition of an additional tax upon foreign insurers domiciled in states whose premium tax rate exceeds that of New Jersey in an amount equivalent to the difference between the foreign and the New Jersey tax rate. Thus if, for instance, Ohio imposed a premium tax at a rate of 2.5% and New Jersey imposed a premium tax at a rate of 2.1%, Ohio domiciled insurers writing business in New Jersey would be subject to an additional retaliatory tax at a rate of 0.4%.

---

[2] The statute actually refers to taxes and fees of various sorts, which are aggregated for purposes of determining retaliatory taxes. We refer to this aggregate as "premium taxes" for ease of reference.

Such retaliatory taxes have now been enacted in all states except Hawaii, and their constitutionality has been affirmed by the United States Supreme Court. *See Western and Southern Life Ins. Co. v. State Bd. of Equalization of California,* 451 *U.S.* 648, 101 *S.Ct.* 2070, 68 *L.Ed.*2d 514 (1981). As explained by Justice Brennan in that decision, the retaliatory tax at issue (as here) was based upon a model statute drafted by the insurance industry and adopted in similar form elsewhere. *Id.* at 669, 101 *S.Ct.* at 2083, 68 *L.Ed.*2d at 531.

> Although variously expressed, the principal purpose of retaliatory tax laws is to promote the interstate business of domestic insurers by deterring other States from enacting discriminatory or excessive taxes. A survey of state retaliatory tax laws summarized:
>
>> "[W]hatever their character, it is obvious ... that their ultimate object is not to punish foreign corporations doing business in the state, or retort the action of the foreign state in placing upon corporations of the enacting state doing business therein burdens heavier than those imposed upon corporations of such foreign state doing business in the enacting state, but to induce such foreign state to show the same consideration to corporations of the enacting state doing business therein as is shown to corporations of such foreign state doing business in the enacting state." Annot., 91 A.L.R. 795 (1934).
>
> [*Id.* at 668–69, 101 *S.Ct.* at 2083, 68 *L.Ed.*2d at 531.]

In essence, the purpose of retaliatory taxes is to alleviate tax burdens for those companies conducting interstate insurance business by placing pressure upon states to lower their tax rates to levels encountered elsewhere, thereby promoting interstate commerce. Their purpose is not to raise revenue. *Id.* at 669–70, 101 *S.Ct.* at 2083–84, 68 *L.Ed.*2d at 531. As we stated in *Employers' Fire Ins. Co. v. Director, Division of Taxation,* 6 *N.J.Tax* 613 (App.Div.1984):

> Retaliatory tax laws are a fact of life in the existence of any insurance company that does business on a national level.... Although such statutes may incidentally produce revenue, the primary purpose sought to be achieved is to compel the foreign state imposing greater costs to lower the "premium or income or other taxes, ... fees, fines, penalties, licenses, deposit requirements or other obligations," or to remove any "prohibitions or restrictions ... imposed upon" the insurance companies of the domiciliary state.
>
> [*Id.* at 615–16 (citations omitted).]

■ The State's retaliatory tax and premium cap provisions thus have different goals: the former is designed to operate so as to level the playing field for insurance companies engaged in interstate business thus encouraging that business; the latter, to give New Jersey a competitive advantage in attracting foreign insurer investment and increased insurance capacity.

New Jersey's premium tax cap and retaliatory tax statutes do not provide an explicit mechanism for their implementation in instances in which both are applicable, and nothing in the legislative history suggests that the Legislature considered the issues potentially arising from possible variations in the method of their dual implementation. This litigation has brought those issues into focus.

To illustrate them, we adopt the numerically simplified examples set forth in the brief submitted on behalf of plaintiffs American Fire and Casualty Company and West American Insurance Company, since their essential accuracy has not been disputed.

If a foreign insurer received premiums of $500,000 on its New Jersey business and was ineligible for the premium tax cap, its premium taxes would be $10,500 (2.1% × $500,000).

If a foreign insurer received New Jersey premiums of $500,000 and nationwide premiums of $1,000,000, thereby qualifying it for New Jersey's premium tax cap, its taxes would be reduced by $7,875. (12.5% of $1,000,000 = 125,000 × 2.1% = $2,625; $10,500–$2,625 = $7,875.)

If a foreign insurer, eligible for the benefits of the premium tax cap, is domiciled in a state with a higher premium tax rate than that of New Jersey (assume 2.5%), then that insurer should be subject to New Jersey's retaliatory tax. However, an issue arises as to how that tax should be computed.

The Director takes the position that utilization of the premium tax cap reduces the effective rate of New Jersey's premium taxes below 2.1%, since a smaller amount of premiums is being taxed than has actually been written in the State. He then contends

that this reduction in New Jersey's effective tax rate must be recaptured by increasing the rate of retaliatory tax assessed or by applying a retaliatory tax to the full amount of premiums written by the foreign insurer in New Jersey and then subtracting the actual taxes paid pursuant to the cap. Thus, utilizing the prior example of a foreign insurer with $1,000,000 premiums nationwide and $500,000 premiums in New Jersey, subject to a retaliatory tax as the result of a tax rate of 2.5% in its state of domicile, the Director would calculate the retaliatory tax as $500,000 (total New Jersey premiums) × 2.5% (domiciliary tax rate) = $12,500–$2,625 (New Jersey tax as capped) = $9,875.

Under the Director's interpretation, a partial recapture of the premium tax cap would occur even if the state of domicile of the foreign insurer had a *lower* tax rate than that of New Jersey (assume 1.8%). Utilizing the prior example, the Director would calculate the tax payable in the domiciliary state as $500,000 (total New Jersey premiums) × 1.8% = $9,000–$2,625 (New Jersey tax as capped) = $6,375 in retaliatory taxation.

The Director does not treat a tax credit in a manner similar to his treatment of the tax cap for retaliatory tax purposes, although the tax cap in many respects resembles a credit, which is the common financial incentive utilized by states to attract the business of foreign insurers. Unlike his treatment of the cap, he does not seek to apply a retaliatory tax to recapture any credits. Thus an inconsistency in his position arises for which no sound justification can be discerned.

The plaintiff insurers, in contrast, contend that the benefits of the tax cap should be preserved. Accordingly, American Fire, West American and the other appellant insurers forming part of the Ohio Casualty group argue that the retaliatory tax should be calculated by subtracting New Jersey's rate from that of the domiciliary state, resulting in 0.4% and multiplying it by the amount of New Jersey gross premiums ($500,000) to yield $2,000. Alternatively, they calculate the retaliatory tax by subtracting the gross premium taxes in New Jersey absent the cap ($500,000 ×

2.1% = \$10,500) from Ohio's taxes on that amount (\$500,000 × 2.5% = \$12,500) for a total retaliatory tax of \$2,000.

Whereas the Ohio Casualty insurers utilize taxes on gross premiums as the basis for their computation, Pruco advocates a symmetrical comparison of its capped premiums as taxed in New Jersey and as theoretically taxed in its domiciliary State, thereby utilizing a net premium tax approach. Neither has directly opposed the view of the other.

By calculating the tax utilizing the Director's methodology, the foreign insurer with a domiciliary rate of 2.5% loses \$7,875 (\$9,875–\$2,000), which is the exact amount that the insurer benefited as the result of the applicability of the premium tax cap in the Ohio Casualty example. The foreign insurer with a domiciliary rate of 1.8% loses \$6,375, since it would not otherwise be subject to a retaliatory tax. Accordingly, the benefit of the tax cap is wholly recaptured or significantly reduced. Because a domestic insurer is not subject to New Jersey's retaliatory tax, no such recapture can occur. Thus, the issues become whether New Jersey's statutory scheme requires that result and whether that scheme, as applied, is constitutional.

## I.

Before further addressing the issues raised by this appeal, we briefly set forth the factual and procedural history leading to this litigation.

Plaintiffs American Fire and West American are insurers in the Ohio Casualty group of companies. American Fire is an Ohio corporation, whereas West American is an Indiana corporation. Both are eligible to claim a premium tax cap. American Fire is incorporated in a state that has a tax rate higher than that of New Jersey of 2.5%. Although West American was incorporated in a state with a statutory tax rate that is lower than New Jersey's (2.0%), the rate is higher than the effective rate in New Jersey as calculated by the Director. Thus, West American, too, was

deemed subject to a partial recapture of savings resulting from the premium tax cap.

In 2001, the two insurers recognized that the manner in which the Director calculated premium and retaliatory taxes[3] deprived them of some or all of the benefit of New Jersey's premium tax cap. Accordingly, they sought refunds for retaliatory taxes paid in prior years.[4] After their refund requests were denied by the Director in final determinations issued on July 12, 2001, they appealed to the Tax Court. Other insurance companies in the Ohio Casualty group that were likewise denied refunds by the Director also challenged his determination. Their appeals, along with other appeals by American Fire and West American, were stayed while the court consolidated and then resolved the actions instituted by American Fire and West American under docket numbers 4714–01 and 4715–01.[5] On December 2, 2003, after considering cross-motions for summary judgment premised on stipulated facts, the court affirmed the determination of the Director in the written decision cited at the beginning of this opinion. Thereafter, the court consolidated the remaining ten Ohio Casualty cases, and on January 30, 2004, again affirmed the Director's determination for the reasons given in its December 2, 2003 opinion. On appeal, the lead American Fire and West American matters were assigned docket number A–2708–03T2, whereas the other Ohio Casualty cases were assigned docket number A–3676–

---

[3] The Director supplied forms for use by the insurers. The manner in which the forms were organized inevitably led to the challenged result.

[4] The relevant monetary figures are set forth in the Tax Court's opinion. *American Fire, supra,* 21 *N.J.Tax* at 160–61.

[5] The following Ohio Casualty group appeals were determined by the Tax Court: *American Fire and Casualty Co. v. Director, Division of Taxation,* Docket Nos. 2366–01, 4714–01 and 4721–01; *West American Insurance Co. v. Director, Division of Taxation,* Docket No. 2365–01 and 4715–01; *Ohio Casualty of New Jersey, Inc. v. Director, Division of Taxation,* Docket Nos. 2934–01, 4711–01, 4713–01, and 4464–02; and *The Ohio Casualty Insurance Company v. Director, Division of Taxation,* Docket Nos. 2357–01, 4712–01 and 4716–01.

03T3. We address the issues raised in those appeals, which are identical, simultaneously.

An appeal arising in the same fashion and raising similar issues was filed by Pruco Life Insurance Company, an Arizona corporation, challenging a March 28, 2003 determination by the Director, affirmed in a March 23, 2004 Tax Court decision based substantially on the grounds set forth in its December 2, 2003 decision in the Ohio Casualty cases. Pruco's case was docketed in the Tax Court as 4508–03 and has been assigned appellate docket number A–4455–03T2. It, too, will be addressed in this opinion.

The main difference between the Pruco case and the two lead Ohio Casualty cases is that the retaliatory tax provision applicable to life and health insurance companies such as Pruco is *N.J.S.A.* 17B:23–5. The text of that statute is in relevant respects substantially similar [6] to that of *N.J.S.A.* 17:32–15, applicable to the Ohio Casualty companies. Pruco, like West American, is incorporated in a state with a lower statutory premium tax rate (2.0%) than New Jersey's and thus would not ordinarily be required to pay retaliatory taxes. The premium tax cap set forth in *N.J.S.A.* 54:18A–6 is applicable to Pruco as well as the other appellants.

## II.

In reaching its decision to affirm the determination of the Director, the tax judge first sought to interpret the intent of the Legislature in passing the premium tax cap and retaliatory tax statutes, and from that analysis, he concluded that "[t]he history of the cap and retaliatory tax statutes suggests that neither statute should affect the interpretation of the other." *American*

---

[6] *N.J.S.A.* 17B:23–5 compares "any taxes, licenses and other fees, in the aggregate, and any fines, penalties, deposit requirements or other obligations, prohibitions or restrictions" in New Jersey and any other state or Canada, whereas *N.J.S.A.* 17:32–15 compares "any premium or income or other taxes, or any fees, fines, penalties, licenses, deposit requirements or other obligations, prohibitions or restrictions" in New Jersey and any other state or foreign country.

*Fire, supra*, 21 *N.J.Tax* at 166. The conclusion was based upon the maxim that the Legislature is presumed to be aware of existing legislation when enacting another statute (*see Mahwah Tp. v. Bergen Cty. Bd. of Taxation*, 98 *N.J.* 268, 279, 486 *A.*2d 818, 823–24, *cert. denied sub nom., Borough of Demarest v. Mahwah Tp.*, 471 *U.S.* 1136, 105 *S.Ct.* 2677, 86 *L.Ed.*2d 696 (1985)) and on the fact that, despite sequential passage of the cap and retaliatory tax statutes and the existence of amendments to each, neither referred to the other.[7] Further, the court noted the participation of members of the insurance industry in proposing amendments to the cap statute enacted in 1985, yet the absence in a contemporaneous memorandum by the Commissioner of Insurance, Hazel F. Gluck, to the Chief of Staff and Counsel to the Governor, dated April 22, 1985, of any reference to the policy of the cap or retaliatory tax or any potential conflict between the two. *American Fire, supra*, 21 *N.J.Tax* at 166.

> The failure of the Legislature, in enacting the retaliatory tax statute and in amending it and the cap statute, to address the conflict between the statutes asserted by plaintiffs, and the omission of any discussion of the issue in the Gluck Memorandum, in combination suggest a legislative intent to have the cap statute and retaliatory tax statute function in the manner adopted by the Director. [*Id.* at 167.]

The tax judge also supported his conclusion by characterizing the plaintiffs' position as contending "that enactment of the retaliatory tax effected an implied partial repeal of *N.J.S.A.* 54:18A–6 so that its cap provisions would not apply in calculating retaliatory tax," *id.* at 167; invoking the rule of statutory construction that implied repealers are not favored, *ibid.*; and determining that, because the two statutes were not repugnant to each other, an implied repeal of one could not be found, *id.* at 168. The retaliato-

---

[7] The cap statute was enacted in 1945 (*L.* 1945, *c.* 132 § 6); the retaliatory tax statute in 1950 (*L.* 1950, *c.* 231, § 1). Amendments to the cap statute occurred in 1985 (*L.* 1985, *c.* 294, § 1) and 1989 (*L.* 1989, *c.* 315, § 1) to preclude use of the cap by New Jersey domiciled affiliates of foreign insurers and to exempt a number of existing companies, including Pruco, from the effects of the closure of this statutory loophole. The retaliatory tax statute was amended in 1985 (*L.* 1985, *c.* 88, § 1).

ry tax statute, the court held, could fulfill its function even if the benefits of the cap were recaptured, since by recapturing the cap and expanding the spread between the effective tax rate in New Jersey and the rate of a foreign state,[8] that state might be encouraged to lower its rates, thereby lessening the tax burdens on New Jersey insurers doing business in that state. *Id.* at 170–71.

In response to the plaintiff insurers' arguments that the Director's interpretation of the two statutes "(i) represents bad policy, (ii) defeats the purpose of the cap statute to induce foreign insurance companies to do increased business in New Jersey, and (iii) does not fulfill the purpose of the retaliatory tax," the court observed:

> Plaintiffs' policy arguments and the analyses by their experts are logical, sensible, and appealing. However, my responsibility is not to interpret the cap and retaliatory tax statutes based on my notions of appropriate policy, but to interpret the statutes based on my analysis of legislative intent. "The judiciary has no power to devise tax programs or to qualify the existing legislative mandate with a judge's private view of what is just or sensible." *Village of Ridgefield Park v. Bergen County Bd. of Taxation,* 31 *N.J.* 420, 431, 157 *A.2d* 829[, 835] (1960). [*Id.* at 171–72.]

As a final matter, the court found that the statutes as interpreted did not violate the Constitution's Equal Protection Clause by creating a preference for domestic insurers, finding a rational basis to exist for the classifications created by the interplay between the premium tax cap and retaliatory tax statutes as applied, depending on whether the taxpayer was a domestic insurer, in which case the insurer received the full benefit of the cap, or whether it was a foreign insurer subject to New Jersey's retaliatory tax, in which case the insurer received little or no benefit from the cap. "New Jersey's retaliatory tax, when calcu-

---

[8] The court noted that "the actual effective rate will vary inversely with the amount by which an insurer's premium revenue in New Jersey exceeds 12.5% of its total premium revenue." *Id.* at 173 n. 3. Thus, if an insurer derived 25% of its premium revenue from New Jersey, the effective premium tax rate would be 1.05%; if it derived 37.5% of its total premium revenue from New Jersey, the effective premium tax rate would be 0.7%.

lated by applying the 12.5% cap, can accomplish [the objective of deterring other states from enacting discriminatory or excessive taxes] and, therefore, satisfies both elements of the rational basis test—the tax serves a legitimate state purpose (influencing the tax burden imposed by foreign states on New Jersey insurers), and the Legislature reasonably could have believed that the tax, as so calculated, could achieve this purpose." *Id.* at 175–76.

## III.

Unlike the Tax Court judge, we are persuaded by the "logical, sensible, and appealing" policy arguments of plaintiffs' counsel and their experts. The application of rules of statutory construction by the tax judge to glean legislative intent, in our view, achieves a counterintuitive result that fails to recognize that the statutes at issue can be jointly applied so as to give effect to the language and purpose of each, and that nothing in statutory history or elsewhere prevents that reconciliation. *See James Const. Co. v. Director, Div. of Taxation,* 18 *N.J.Tax* 224, 232 (1999) ("In the absence of an express repeal, the new provision is presumed to be in accord with the legislative policy embodied in prior statutes. Accordingly, they should be construed together and even if in apparent conflict, construed in harmony if reasonably possible."). *See also Palmer v. Kingsley,* 27 *N.J.* 425, 429, 142 *A.*2d 833, 835 (1958) (construing statutes *in pari materia* although enacted at different times and codified in different statutory titles). It is clear from the foregoing portions of this opinion that the retaliatory tax and premium tax cap statutes have wholly different purposes. In his determination to affirm the decision of the Director, the tax judge gave effect to the retaliatory tax provisions, while eviscerating the purpose of the premium tax cap. We find no solid grounds for doing so in the logic of the court's decision, the language of the relevant statutes, or their evident purposes.

We commence by noting that the premium tax cap statute explicitly and unambiguously states that the premiums of a compa-

ny eligible for the cap that are taxable in New Jersey "shall not exceed twelve and one-half percentum." *N.J.S.A.* 54:18A–6. As our prior example illustrates, the Director effectively taxes a higher percentage of premiums, contrary to this statutory language. That result was affirmed by the tax judge. However, a court "should strive for an interpretation that gives effect to all of the statutory provisions and does not render any language inoperative, superfluous, void, or insignificant." *In re Green Brook Flood Control Project,* 370 *N.J.Super.* 122, 130, 850 *A.*2d 596, 601 (App.Div.2004) (quoting *G.S. v. Dept. of Human Servs.,* 157 *N.J.* 161, 172, 723 *A.*2d 612, 617 (1999)).

We note additionally that the tax cap statute, as enacted in 1945 and as amended in 1985 and 1989, makes specific reference to its applicability to foreign insurers, as does the 1985 legislative history, quoted previously. It is thus contrary to statutory language and the rules of statutory construction that we have set forth to eliminate the benefits of the cap for most if not all foreign insurers. *Ibid.*

That legislative history further demonstrates a concern that the cap not be formulated in a fashion that would be viewed as discriminating against foreign competition either under the Commerce Clause, in 1945 (*see* Statement to Assembly No. 190, introduced February 5, 1950, noting that the former retaliatory tax act had been repealed because of Commerce Clause concerns) or after the passage of the McCarran–Ferguson Act, under equal protection analysis. The 1985 Gluck memorandum that we previously cited discusses a suggestion by the Chubb Insurance group for a statutory amendment resulting in disparately favorable treatment to domestic insurers and specifically rejects that suggestion because of the high probability that it could not withstand equal protection challenge.[9] Gluck, *supra,* at 6. Thus, an imple-

---

[9] *See Metropolitan Life Ins. Co. v. Ward,* 470 *U.S.* 869, 105 *S.Ct.* 1676, 84 *L.Ed.*2d 751 (1985) (striking down a domestic tax preference as violating the Equal Protection Clause by discriminating against foreign insurers).

mentation of the retaliatory tax statute so as to recapture the benefits of the premium tax cap solely from foreign insurers appears contrary to analyses of the law circulated at the time of relevant statutory amendments. We have no evidence that the Legislature sought to ignore constitutional concerns, or that they were ignored by the Governor in signing the legislation into law.

Further, although we can presume that the Legislature was aware of the cap statute when it passed the retaliatory tax law in 1950, *Mahwah Tp., supra,* 98 *N.J.* at 279, 486 *A.*2d at 823–24, we find nothing in the legislative history provided by the parties in these appeals to suggest that the Legislature was apprised of the Director's position as to the manner of interaction of the two statutes, that the effects of that position were known to affected insurers at any time prior to the submission of the present refund requests—something that occurred several years after the last amendments to the statutes at issue—or that the insurers ever called the anomaly created by the Director's position to the attention of the Legislature. The amounts involved, when viewed individually, were relatively small, and there is no evidence in the record to dispute the fact, asserted by the Ohio Casualty insurers, that because the tax returns were not inspected by them with this problem in mind, its existence was overlooked.

Even the 1985 Gluck memo, relied upon by the court in sustaining the position of the Director that his method of computation accorded with legislative intent, *American Fire, supra,* 21 *N.J.Tax* at 166–67, does nothing to support that position. As we have stated, at the time of the amendments at issue, attention was focused on the recent creation by foreign insurers of independent New Jersey domiciled affiliates for the purpose of taking advantage of the tax cap, thereby reducing New Jersey tax revenues, and upon means for avoiding this result—eventually effectuated by requiring that the worldwide premiums of a foreign insurer and its affiliates be considered jointly for purposes of the application of the cap. The Gluck memorandum summarizes, comments upon and makes recommendations with respect to the suggestions of

New Jersey domiciled insurers to close the statutory loophole. Because of their New Jersey domicile, those New Jersey companies had never been subject to New Jersey's retaliatory tax, and thus they had no reason to have knowledge of or challenge the position taken by the Director (assuming it was the same then as now). The New Jersey affiliates that were the focus of the amendment, while not providing comments, had similarly been insulated from the imposition of New Jersey retaliatory taxes. There is nothing in the Gluck memorandum to otherwise suggest that any insurer raised the issue of the interaction between the premium tax cap and the retaliatory tax statutes. Indeed, as the tax judge acknowledged, "[n]either party presented any evidence that the insurance industry actually lobbied the New Jersey Legislature with respect to [this] issue[ ]." *American Fire, supra,* 21 *N.J.Tax* at 167.

Additionally, we find no recognized practical justification for a construction of the two statutes that would result in the implementation of the retaliatory tax statute at the expense of the premium tax cap.[10] Indeed, the court's logic in that regard, as the plaintiff insurers point out, appears wholly flawed. *See American Fire, supra,* 21 *N.J.Tax* at 170–71. According to the Director, the existence of a premium tax cap reduces the effective rate of taxation in New Jersey, increasing the spread between New Jersey's tax rate and that of any other state, including those states whose tax rate, without consideration of the cap, is equal to or lower than that of New Jersey. The Director seeks to recapture this spread through the imposition of increased retaliatory taxes. The tax judge found "the retaliatory tax as calculated by the Director (with the 12.5% cap included in the calculation) can function to encourage other states to lower their tax burdens on

---

[10] To the extent that the retaliatory tax statute is ambiguous, it should be construed in favor of the taxpayer. *Fedders Fin. Corp. v. Director, Div. of Taxation,* 96 *N.J.* 376, 385, 476 A.2d 741, 745 (1984); *Liberty Mut. Ins. Co. v. State, Dept. of Treasury, Div. of Taxation,* 17 *N.J.Tax* 457, 481–82 (1998).

New Jersey insurers doing business in those states." *American Fire, supra,* 21 *N.J.Tax* at 171.

However, the imposition of these additional taxes on foreign insurers in this circumstance does nothing to effect the stated purpose of the retaliatory tax statute—to level the playing field or to reduce the incidence of excessive taxes in foreign states while preserving a reasonable level of taxation—since, if the New Jersey retaliatory tax is applied as the Director suggests, it would not serve just to reduce high taxes or equalize them, but rather to precipitate a downward spiral in taxation as each state sought to protect its domestic insurers' interstate operations by lowering the effective rate of taxation. If, for instance, a foreign state adopted a 1.8% premium tax rate, that rate could be undercut by New Jersey's effective tax rate as lowered through taxation of only those premiums subject to the cap, thereby invoking New Jersey's retaliation against insurers domiciled in that foreign state, despite the fact that New Jersey's stated rate was 2.1%. We have illustrated this result previously. For domiciliaries of the foreign state to escape the effects of New Jersey's retaliatory tax, that state would have to reduce its tax rate to one considerably below that of New Jersey. However, if it were to do so, then New Jersey domiciled insurers writing business in the foreign state would be subject to that state's retaliatory tax. A negative impact on New Jersey would thus be created. We find no evidence that any legislature has determined that premium taxes should thereby be reduced to a de minimis level, depriving states of a legitimate source of revenue, or that retaliation of the type that we have illustrated was contemplated when retaliatory taxes were conceived as a means of lessening or equalizing tax burdens nationwide.

Further, we discern no legitimate purpose to be served by utilizing the retaliatory tax to encourage other states to enact a premium tax cap, thereby lowering their effective rate of taxation. At present, we are informed, New Jersey is the only state to have enacted such a cap as a means of attracting insurance business to this state. It certainly cannot seek competition among other

states for scarce insurance resources through their adoption of a similar mechanism.

Moreover, the result achieved by the Director nullifies the purpose of the premium tax cap, in that it removes any incentive on the part of a foreign insurer to write a substantial amount of its business and otherwise invest in the economy of this State.

In a case such as this in which it is evident that the Legislature did not consider the manner of interaction of elements of a statutory taxation scheme, it is essential that we look to the purposes of the relevant statutes in determining their manner of implementation. *Stryker Corp. v. Director, Div. of Taxation,* 18 *N.J.Tax* 270, 279 (1999), *aff'd,* 19 *N.J.Tax* 115 (App.Div.2000), *aff'd,* 168 *N.J.* 138, 773 *A.*2d 674 (2001). We are unaware of any rule of statutory construction that requires that the policy goals of one statute be ignored in order to effectuate the purposes of another, if in fact the operation of the two statutes can be reconciled. As the Supreme Court observed in *Reuben H. Donnelley Corp. v. Director, Div. of Taxation,* 128 *N.J.* 218, 227, 607 *A.*2d 1281, 1286 (1992):

> In construing a statute the court's primary task is to "effectuate the legislative intent in light of the language used and the objectives sought to be achieved." *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256[, 1259] (1992) (quoting *State v. Maguire,* 84 *N.J.* 508, 514, 423 *A.*2d 294[, 297] (1980)). "[T]he Court fulfills its role by construing a statute in a fashion consistent with the statutory context in which it appears." *Waterfront Comm'n v. Mercedes–Benz,* 99 *N.J.* 402, 414, 493 *A.*2d 504 (1985). In construing legislation "every effort should be made to harmonize the law relating to the same subject matter." *Superior Air Prods. Co. v. NL Indus.,* 216 *N.J.Super.* 46, 63–64, 522 *A.*2d 1025[, 1035] (App.Div.1987).

Here, the Director's interpretation neither fulfills the stated purpose of the retaliatory tax statute, since it subverts its use as a tax equalization mechanism; acts as a potentially unconstitutional revenue producing device, contrary to the representations of the industry at the time such statutes were enacted and considered by the United States Supreme Court; and further acts to "punish" a class of foreign insurers writing significant business in this State in a manner contrary to the purposes of the statute. The interpretation also fails to effectuate the investment and business-

attracting purposes of the tax cap statute, and thus is inconsistent both with the Legislature's intent and the entire statutory scheme of taxation of insurance premiums. *Ibid.*

Adoption of the Director's interpretation is not statutorily required; the harmonization that should be our ultimate goal can be achieved. *Superior Air Prod. v. NL Indus.*, 216 *N.J.Super.* 46, 63–64, 522 *A.*2d 1025, 1035 (App.Div.1987). The retaliatory tax statutes at issue, *N.J.S.A.* 17:32–15 (applicable to the Ohio Casualty companies) and 17B:23–5 (applicable to Pruco), permit great leeway in determining how they shall be applied, since they are wholly nonspecific as to the manner in which, in the language of *N.J.S.A.* 17:32–15, the "premium or income or other taxes, or any fees, fines, penalties, licenses, deposit requirements or other obligations, prohibitions or restrictions" imposed by a foreign state or New Jersey are to be calculated or compared. Thus, the statute can be construed, as the plaintiff insurers argue, so as to compare either the statutory rate of taxes on gross premiums in New Jersey and the foreign domicile in order to determine the amount of the retaliatory tax, before taking the cap into account or the net premiums as taxed in New Jersey and theoretically taxed elsewhere.[11] Indeed, this is essentially what occurs in instances in which foreign insurers are not eligible for the premium tax cap. Thus, both groups of foreign insurers would be treated similarly for purposes of retaliatory taxation. Such an interpretation, unlike that adopted in the Tax Court, would give effect to the purposes of both statutes, while diminishing the effect of neither.

---

[11] The plaintiff insurers thus do not obtain an exemption from retaliatory taxation, nor do they seek a determination that there has been an implied partial repeal of the retaliatory tax statute. They advocate a harmonization of the application of the statutes, by which they their acknowledged retaliatory tax obligation is not adversely affected by the operation of the premium tax cap so as to eliminate the cap's benefits. The retaliatory tax statute is not thereby impliedly repealed, as the court held. *American Fire, supra,* 21 *N.J.Tax* at 167–70.

If Pruco's net tax approach is adopted, the notion of an implied repeal has no foundation whatsoever.

As we have stated, New Jersey is the sole state to have adopted a tax cap as a means of attracting insurance business. However, decisions elsewhere construing retaliatory tax statutes in light of tax credit provisions aimed at attracting foreign insurance business have reached similar results to those espoused by the insurers here. *See, e.g.,* Lee R. Russ, *Annot., Construction, Application, and Operation of State "Retaliatory" Statutes Imposing Special Taxes or Fees on Foreign Insurers Doing Business Within the State,* 30 *A.L.R.*4th 873 (1984).

## IV.

The insurers argue as well that the manner in which the Director has interpreted the retaliatory tax statute, so as to deprive foreign insurers of the benefit of the premium tax cap, unconstitutionally discriminates against foreign insurers in violation of principles of equal protection, thereby creating a constitutional problem that can and should be resolved by adoption of the insurers' proposed application of the retaliatory tax statute. *See Garfield Trust Co. v. Director, Div. of Taxation,* 102 *N.J.* 420, 433, 508 *A.2d* 1104, 1111 (finding that it is the duty of the court to construe a statute in a manner that would render it constitutional, if reasonably susceptible to such interpretation), *appeal dismissed,* 479 *U.S.* 925, 107 *S.Ct.* 390, 93 *L.Ed.*2d 345 (1986).

The tax judge found that New Jersey's statutory scheme passed constitutional muster since a rational basis for its enactments could be found. On appeal, the Director urges our affirmance of this principle; the insurers claim that the United States Supreme Court has abandoned a strict rational basis analysis in considering challenges of this sort, and that under the more stringent analysis adopted by it, New Jersey's statutes are unconstitutional as applied because they discriminate between foreign and domestic insurers.

It is well recognized that the Commerce Clause is not applicable to the business of insurance as the result of the passage of the McCarran–Ferguson Act, 15 *U.S.C.A.* § 1011 to –15. *See*

*State Bd. of Ins. v. Todd Shipyards Corp.,* 370 *U.S.* 451, 452, 82 *S.Ct.* 1380, 1381, 8 *L.Ed.*2d 620, 622 (1962). Further, the Privileges and Immunities Clause of the Constitution, Art. IV, § 2, is inapplicable, because corporations are not held to be "persons" to which that clause applies. *See Hemphill v. Orloff,* 277 *U.S.* 537, 548–50, 48 *S.Ct.* 577, 578, 72 *L.Ed.* 978, 983–84 (1928). As a consequence, modern insurance cases raising issues such as presented here are decided under equal protection principles.

As we have already noted, in *Western and Southern Life Insurance Co., supra,* the Supreme Court held on equal protection grounds that California's retaliatory tax provisions did not violate equal protection principles. 451 *U.S.* at 668–74, 101 *S.Ct.* at 2083–86, 68 *L.Ed.*2d at 530–35. That decision, although determined by use of the "rational basis" test traditionally applicable in instances in which no suspect classification is involved, turned in large measure upon the recognition that the insurance industry itself had proposed adoption of retaliatory taxes on a nationwide basis, not as a means of producing significant revenue at the expense of out-of-state insurers, but "as a means to apply pressure on other States to maintain low taxes on California insurers." *Id.* 451 *U.S.* at 669–70, 101 *S.Ct.* at 2084, 68 *L.Ed.*2d at 531. On this basis, the Court held that: "There can be no doubt that promotion of domestic industry by deterring barriers to interstate business is a legitimate state purpose" and "[t]he mere fact that California seeks to promote its insurance industry by influencing the policies of other States does not render the purpose illegitimate." *Id.* at 671, 101 *S.Ct.* at 2084, 68 *L.Ed.*2d at 532. The Court thus found that the purpose of enacting the retaliatory tax—"to promote the *interstate* business of domestic insurers by deterring *other States* from enacting discriminatory or excessive taxes," *Metropolitan Life Insurance Company v. Ward,* 470 *U.S.* 869, 877, 105 *S.Ct.* 1676, 1681, 84 *L.Ed.*2d 751, 759 (1984)—was legitimate, and found as well that the California Legislature rationally could have believed that the retaliatory tax would promote its objective. *Id.* 451 *U.S.* at 671, 101 *S.Ct.* at 2085, 68 *L.Ed.*2d at 533.

However, it is notable that the Court also observed:

We consider it now established that, whatever the extent of a State's authority to exclude foreign corporations from doing business within its boundaries, that authority does not justify imposition of more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose.

[*Id.* at 667–68, 101 *S.Ct.* at 2083, 68 *L.Ed.*2d at 530.]

The narrow context in which *Western and Southern Life Insurance* has precedential value is illustrated by the Court's decision three years later in *Ward, supra,* 470 *U.S.* 869, 105 *S.Ct.* 1676, 84 *L.Ed.*2d 751, a case in which an Alabama gross insurance premium tax scheme that differentially and more severely impacted upon foreign insurers than it did upon domestic insurers [12] was held unconstitutional on equal protection grounds, despite the rational relationship of the tax scheme to the encouragement of domestic insurance business.

The *Ward* decision has been widely commented upon as the result of its seeming departure from the strict rational basis analysis traditionally employed when non-suspect classifications are challenged. What the Court did in that case has variously been characterized as the adoption in this context of "rational basis with a bite," (*see, e.g.,* Gayle Lynn Pettinga, *Note, Rational Basis with Bite: Intermediate Scrutiny by Any Other Name,* 62 *Ind. L.J.* 779 (1987)), as some level of intermediate scrutiny (*see, e.g.,* Hartwin Bungert, *Equal Protection for Foreign and Alien Corporations: Towards Intermediate Scrutiny for a Quasi-suspect Classification,* 59 *Mo. L. Rev.* 569, 611 (1994)), or as "Commerce Clause rhetoric in equal protection clothing." *Ward, supra,* 470 *U.S.* at 880, 105 *S.Ct.* at 1683, 84 *L. Ed.*2d at 761 (repeating Alabama's characterization).[13] Whatever the label, it is clear that

---

[12] The tax statute imposed a higher rate of taxation on gross premiums generated in Alabama by foreign insurers, which could be lessened by investment of stated percentages of the insurer's worldwide assets in designated Alabama assets and securities. However, a tax differential remained even if such investments were made.

[13] The *Ward* Court found this characterization to be inapt, stating:

the Court departed in *Ward* from a traditional analysis that would, almost inevitably, have validated Alabama's differential tax scheme as rationally related to a legitimate state purpose, finding illegitimate a tax scheme that discriminated against foreign insurers. *Ward's* analysis has not been repudiated. *See, e.g., Fitzgerald v. Racing Assn. of Central Iowa,* 539 *U.S.* 103, 107, 123 *S.Ct.* 2156, 2159, 156 *L.Ed.*2d 97, 103 (2003) (distinguishing *Ward's* equal protection analysis from that applicable to the different context of the case before the court).

As characterized by Justice O'Connor writing in dissent on behalf of herself and Justices Brennan, Marshall and Rehnquist: "This tax seeks to promote both a domestic insurance industry and capital investment in Alabama." 470 *U.S.* at 884, 105 *S.Ct.* at 1684, 84 *L.Ed.*2d at 763. The Justice continued:

> Our precedents impose a heavy burden on those who challenge local economic regulation solely on Equal Protection Clause grounds. In this context, our long-established jurisprudence requires us to defer to a legislature's judgment if the classification is rationally related to a legitimate state purpose. Yet the Court evades this careful framework for analysis, melding the proper two-step inquiry regarding the State's purpose and the classification's relationship to that purpose into a single unarticulated judgment. This tactic enables the Court to characterize state goals that have been legitimated by Congress itself as improper solely because it disagrees with the concededly rational means of differential taxation selected by the legislature.. . Most troubling, the Court discovers in the Equal Protection Clause an implied prohibition against classifications whose purpose is to

---

> Under Commerce Clause analysis, the State's interest, if legitimate, is weighed against the burden the state law would impose on interstate commerce. In the equal protection context, however, if the State's purpose is found to be legitimate, the state law stands as long as the burden it imposes is found to be legitimate, the state law stands as long as the burden it imposes is found to be rationally related to that purpose, a relationship that is not difficult to establish.
>
> * * *
>
> The two constitutional provisions perform different functions in the analysis of the permissible scope of a State's power-one protects interstate commerce, and the other protects persons from unconstitutional discrimination by the States.
>
> [470 *U.S.* at 881, 105 *S.Ct.* at 1683, 84 *L.Ed.*2d at 761 (footnote omitted).]

give the "home team" an advantage over interstate competitors even where Congress has authorized such advantages.14

[*Id.* at 884–85, 105 *S.Ct.* at 1685, 84 *L.Ed.*2d at 763.]

We have quoted the dissent in *Ward* at length to illustrate the divergence of the majority decision from traditional rational basis analysis. The majority found that the parties had waived a hearing to determine whether Alabama's domestic preference tax statute bore a rational relationship to the two purposes identified by the state court: (1) encouragement of the formation of new domestic insurance companies in Alabama; and (2) encouragement of capital investment in the Alabama assets and governmental securities specified in the statute. It therefore focused on whether the stated purposes were legitimate. *Id.* at 875, 105 *S.Ct.* at 1680, 84 *L.Ed.*2d at 757–58. Neither could found to be so, the Court held, because, rather than attempting "to influence the policies of other States in order to enhance its domestic companies' ability to operate interstate . . . it has erected barriers to foreign companies who wish to do interstate business in order to improve its domestic insurers' ability to compete at home." *Id.* 470 *U.S.* at 877–78, 105 *S.Ct.* at 1681, 84 *L.Ed.*2d at 759. The State may not, the Court held, "favor its own residents by taxing foreign corporations at a higher rate solely because of their residence." *Id.* at 878, 105 *S.Ct.* at 1682, 84 *L.Ed.*2d at 759. The encouragement of investment in Alabama, the Court found, did not constitute a legitimate state purpose "when furthered by discrimination." *Id.* at 882, 105 *S.Ct.* at 1684, 84 *L.Ed.*2d at 762.

When we view New Jersey's statutory scheme, as applied by the Director, in light of the precedent established by *Western and Southern Life Insurance* and *Ward*, its potential constitutional infirmity becomes evident. First of all, that scheme bears no rational relationship whatsoever to the goals of the premium tax cap statute, since it eliminates the incentive of foreign insurers (a category that the statute by its terms was enacted to benefit,

---

14 Justice O'Connor appears to refer in this regard to the McCarran–Ferguson Act, relegating the regulation of the business of insurance to the states.

along with domestic insurers) to write business and invest in New Jersey and thus constricts the market for insurance in the State and associated investment by foreign insurers here. Moreover, as the plaintiff insurers argue, it subverts the purposes of the retaliatory tax statute by either (1) transforming the statute into a likely-forbidden revenue producing measure,[15] instead of a tax equalization one or (2) inducing a downward spiral of tax rates, thereby depriving the State of needed revenue and potentially harming domestic New Jersey insurers. As stated by the Supreme Court in *Allied Stores of Ohio v. Bowers,* 358 *U.S.* 522, 79 *S.Ct.* 437, 3 *L.Ed.*2d 480 (1959):

> [T]here is a point beyond which the State cannot go without violating the Equal Protection Clause. The State must proceed upon a rational basis and may not resort to a classification that is palpably arbitrary. The rule often has been stated to be that the classification "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation."
>
> [*Id.* at 527, 79 *S.Ct.* at 441, 3 *L.Ed.*2d at 485 (quoting *F.S. Royster Guano Co. v. Virginia,* 253 *U.S.* 412, 415, 40 *S.Ct.* 560, 561, 64 *L.Ed.* 989, 990–91 (1920)).]

We do not find that standard to have been met.

We note as well the emphasis of the *Western and Southern Life Ins.* Court upon the promotion of interstate business as a justification for an otherwise suspect or forbidden retaliatory tax. Here, that laudatory goal is not met, but is instead eroded by the Director's application of New Jersey's taxing scheme. We note as well the unusual factual circumstances underlying *Western and Southern Life Ins.,* created by a nationally adopted taxation regime enacted to pressure states into achieving parity in taxation, and the Court's reliance on those circumstances in legitimating the taxes at issue. No such scheme inheres to the Director's interpre-

---

[15] The Court in *Western and Southern Life Ins., supra,* laid the groundwork for this conclusion when it observed:

> The retaliatory tax is not imposed on foreign corporations *qua* foreign corporations, as would be expected were the purpose of the tax to raise revenue from noncitizens; rather, it is imposed only on corporations whose home States impose more onerous burdens on California insurers than California otherwise would impose on those corporations.
>
> [*Id.* 451 *U.S.* at 670 n. 23, 101 *S.Ct.* at 2084 n. 23, 68 *L.Ed.*2d at 532 n. 23.]

tation of New Jersey's tax laws, nor does his application of those laws have the effect that was demonstrated in *Western and Southern Life Ins.*

The tax judge found that New Jersey's retaliatory tax, when calculated by applying the 12.5% cap can accomplish the objective of deterring other states from enacting discriminatory or excessive taxes and that it thus both served a legitimate state purpose (influencing the tax burden imposed by foreign states on New Jersey insurers) and the Legislature reasonably could have believed the tax, as calculated, could achieve that purpose. *American Fire, supra,* 21 *N.J.Tax* at 175–76. We reject this rationale, finding for reasons previously stated that the tax as applied cannot reasonably be expected to produce these results, nor could the Legislature (if it had known of the Director's interpretation, which it apparently did not) reasonably have believed it could.

In *Ward's* terms, we find no legitimate purpose in the Director's approach to the two statutes, since that approach, by creating an unjustifiable domestic preference, is purely and completely discriminatory in its application. It is this type of discrimination that the *Ward* Court found to violate the Equal Protection Clause. 470 *U.S.* at 878, 105 *S.Ct.* at 1681–82, 84 *L.Ed.*2d at 759. As a consequence we reverse the determination upholding the Director's interpretation of the retaliatory tax statute so as to recoup part or all of the benefits of New Jersey's premium cap.

Reversed with the direction that the Director, Division of Taxation recalculate refunds due to plaintiffs in accordance with the principles set forth in this opinion.