912 A.2d 126

AMERICAN FIRE AND CASUALTY COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

AMERICAN FIRE AND CASUALTY COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

AMERICAN FIRE AND CASUALTY COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

THE OHIO CASUALTY INSURANCE COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

THE OHIO CASUALTY INSURANCE COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

THE OHIO CASUALTY INSURANCE COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

OHIO CASUALTY OF NEW JERSEY, INC., PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

OHIO CASUALTY OF NEW JERSEY, INC., PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

OHIO CASUALTY OF NEW JERSEY, INC., PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

WEST AMERICAN INSURANCE COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

WEST AMERICAN INSURANCE COMPANY, PLAINTIFF–
RESPONDENT, v. NEW JERSEY DIVISION OF
TAXATION, DEFENDANT–APPELLANT.

OHIO CASUALTY OF NEW JERSEY, INC., PLAINTIFF-RESPONDENT, v. NEW JERSEY DIVISION OF TAXATION, DEFENDANT–APPELLANT.

PRUCO LIFE INSURANCE COMPANY, PLAINTIFF–RESPONDENT, v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT–APPELLANT.

Argued November 30, 2005—Decided October 19, 2006.

68

*Patrick DeAlmeida,* Assistant Attorney General, argued the cause for appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Carol Johnston,* Senior Deputy Attorney General, on the briefs).

*Michael A. Guariglia* argued the cause for respondent Pruco Life Insurance Company (*McCarter & English,* attorneys; *Mr. Guariglia* and *Open Weaver Banks,* on the brief).

*Richard D. Pomp,* a member of the Massachusetts bar, argued the cause for respondents American Fire and Casualty Company, The Ohio Casualty Insurance Company, Ohio Casualty of New Jersey, Inc. and West American Insurance Company (*Richard A.*

*Leavy,* attorney; *Margaret C. Wilson* and *Mr. Pomp,* on the brief).

JUSTICE ZAZZALI delivered the opinion of the Court.

In this matter, the Court must determine the proper relationship between the State's retaliatory tax statute, *N.J.S.A.* 17:32–15, 17B:23–5, and its premium tax cap statute, *N.J.S.A.* 54:18A–6. Plaintiffs, three foreign insurance companies conducting business in New Jersey, challenge the Director of the Division of Taxation's (Director) interpretation of those statutes and allege that the Director's interpretation is unsupported by the text and purposes of the statutes. They also claim that the Director's interpretation violates their right to equal protection under the laws and constitutes a *de facto* rulemaking by an agency that is subject to the rulemaking requirements of the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –25. The Tax Court found in favor of the Director. On appeal, the Appellate Division reversed, concluding that the Director's interpretation failed to properly give effect to both statutes and that it was unconstitutional under the Equal Protection Clause. We affirm on statutory grounds and hold that the statutes must be harmonized and interpreted as set forth by plaintiffs.

We begin with an identification of the tax statutes at issue and the parties' conflicting positions on the relationship between those statutes. Next, we summarize the factual and procedural history of this appeal. Finally, we determine the proper method for calculating a foreign insurer's retaliatory tax obligation under *N.J.S.A.* 17:32–15, in circumstances where the premium tax cap statute, *N.J.S.A.* 54:18A–6, is also applicable.

I.

A.

The New Jersey premium tax, *N.J.S.A.* 54:18A–1 to –11, requires all domestic and foreign insurance companies conducting

business in the State to pay an annual tax "based on net premiums on contracts of insurance covering property and risks located within this State written during the calendar year." *N.J.S.A.* 54:18A–1. Pursuant to the premium tax, the tax rate for non-life insurers as well as life and health insurers is currently 2.1% of taxable premiums. *N.J.S.A.* 54:18A–2(a), –3(a). The premium tax cap statute, *N.J.S.A.* 54:18A–6(a), however, creates a cap on taxable premiums for foreign and domestic insurers whose receipt of New Jersey premiums accounts for more than 12.5% of their total worldwide premiums. That statute, unique to New Jersey, was enacted in 1945 and provides, in pertinent part:

> In the event that the taxable premiums collected by any company, as specified in [*N.J.S.A.* 54:18A–4, –5], and all of its affiliates ... during any year ending December thirty-first, exceed twelve and one-half percentum (12 1/2%) of the total premiums collected by the company and all of its affiliates during the same year on all policies and contracts of insurance, whenever and wherever issued, the taxable premiums of such company shall not exceed a sum equal to twelve and one-half percentum (12 1/2%) of such company's total premiums collected during the same year on all policies and contracts of insurance....
>
> [*N.J.S.A.* 54:18A–6(a).]

The statute, therefore, encourages insurance companies to conduct more business in New Jersey because, once the 12.5% threshold is met, an insurer pays premium tax on only 12.5% of its worldwide premiums, regardless of any premiums that it writes in this State in excess of that amount. In amending the statute in 1985, the Senate Committee on Labor explained:

> The limitation of the maximum amount of premium tax payable *was intended to be available to those insurance companies, domestic or foreign, which make a substantial commitment to New Jersey and contribution to its economy* as evidenced by the percentage of overall business written in this State compared to elsewhere. Typically, insurance companies qualifying for the limitation had significant numbers of New Jersey employees providing service to policyholders and claimants residing here, paid substantial sums of real property taxes, maintained deposits in local banks, invested considerable funds in local securities and companies and generally contributed to the economy by utilizing other local services and businesses.
>
> ....
>
> ... *[T]he preference provides insurance companies with incentive to voluntarily write significant amounts of business in New Jersey.*
>
> [Statement to Senate Bill No. 2995 (emphasis added).]

In addition to premium tax, foreign insurers operating in the State also are subject to retaliatory tax if their home state's rate of taxation is higher than New Jersey's 2.1% rate. *N.J.S.A.* 17:32–15, 17B:23–5. In such a situation, an insurer pays retaliatory tax in an amount equal to the difference between the two rates. *N.J.S.A.* 17:32–15, 17B:23–5. The retaliatory tax statute states, in pertinent part:

> When by the laws of any other state ... any premium or income or other taxes, or any fees, fines, penalties, licenses, deposit requirements or other obligations, prohibitions or restrictions are imposed upon New Jersey insurance companies ... doing business in such other state ..., which are in excess of such taxes, fees, fines, penalties, licenses, deposit requirements or other obligations, prohibitions or restrictions imposed upon insurance companies ... doing business in New Jersey, ... so long as such laws continue in force the same premium or income or other taxes, or fees, fines penalties, licenses, deposit requirements or other obligations, prohibitions and restrictions of whatever kind shall be imposed upon insurance companies ... of such other state ... doing business in New Jersey....
>
> [*N.J.S.A.* 17:32–15.] [1]

In *Employers' Fire Insurance Co. v. Director, Division of Taxation,* the Appellate Division explained the purpose of the retaliatory tax statute:

> Each state which has sufficient number of domiciliary companies doing such business has a retaliatory tax law, the purpose of which is to protect its domestic insurance companies from the imposition by a sister state of taxes or other costs of doing business which exceed the costs of doing business in the domiciliary state. Where a state imposes such higher costs of doing business upon insurance corporations of another state the latter state retaliates by imposing the same costs upon the insurance companies of that state conducting business within its borders. *Although such statutes may incidentally produce revenue, the primary purpose sought to be achieved is to compel the foreign state imposing greater costs to lower the "premium or income or other taxes, ... fees, fines, penalties, licenses, deposit requirements or other obligations," or to remove any "prohibitions or restrictions ... imposed upon" the insurance companies of the domiciliary state.*
>
> [6 *N.J. Tax* 613, 615 (App.Div.1984) (emphasis added) (citations omitted).]

The United States Supreme Court upheld the constitutionality of a retaliatory tax scheme in *Western & Southern Life Insurance*

---

[1] Non-life insurers are subject to retaliatory tax under *N.J.S.A.* 17:32–15. Life insurers are subject to retaliatory tax under *N.J.S.A.* 17B:23–5, which, for purposes of this appeal, is sufficiently similar to *N.J.S.A.* 17:32–15 so as not to require a separate discussion.

*Co. v. State Board of Equalization of California*, 451 *U.S.* 648, 674, 101 *S.Ct.* 2070, 2086, 68 *L.Ed.*2d 514, 535 (1981). In that case, California had imposed a premium tax and retaliatory tax on foreign insurers operating in that state. *Id.* at 649–50, 101 *S.Ct.* at 2073, 68 *L.Ed.*2d at 518. Applying a rational basis review to the retaliatory tax statute, the Court upheld the statute, finding that it furthered the legitimate state purpose of "promot[ing] the interstate business of domestic insurers *by deterring other States from enacting discriminatory or excessive taxes.*" *Id.* at 668, 101 *S.Ct.* at 2083, 68 *L.Ed.*2d at 531 (emphasis added). As the Court explained:

> [Whatever] their character it is obvious ... that their ultimate object is not to punish foreign corporations doing business in the state, or retort the action of the foreign state in placing upon corporations of the enacting state doing business therein burdens heavier than those imposed upon corporations of such foreign·state doing business in the enacting state, *but to induce such foreign state to show the same consideration to the corporations of the enacting state doing business therein as is shown to corporations of such foreign state doing business in the enacting state.*
>
> [*Id.* at 668–69, 101 *S.Ct.* at 2083, 68 *L.Ed.*2d at 531 (emphasis added) (citation and quotation marks omitted).]

The Court also found that because the amount of revenue raised under the tax was modest, it was clear "that the purpose [of the tax was] not to generate revenue at the expense of out-of-state insurers, but to apply pressure on other States to maintain low taxes on California insurers." *Id.* at 669–70, 101 *S.Ct.* at 2083–84, 68 *L.Ed.*2d at 531. Retaliatory taxes now exist in every state except Hawaii.

### B.

Standing alone, the two statutes are easy to implement. However, because of their divergent effects—the premium tax cap operates to lower an insurance company's taxes, whereas the retaliatory tax operates to raise them—when both statutes apply to one company, complications arise concerning their interaction. The Director, in conjunction with the Commissioner of Banking and Insurance (Commissioner), oversees the taxation of insurance companies operating in the State. Pursuant to that authority, the

Director has interpreted the two statutes based on a plain reading of their language. Plaintiffs American Fire and Casualty Company (American Fire), Pruco Life Insurance Company (Pruco Life), and West American Insurance Company (West American) are foreign insurance companies conducting business in New Jersey. Plaintiffs dispute the Director's interpretation and offer their own theory on how the two statutes interrelate. Those differing interpretations are well illustrated by way of examples set forth in plaintiffs American Fire and West American's joint brief. Accordingly, we use hypothetical amounts to explain the parties' positions and adopt plaintiffs' methodology.

We first examine the operation of the premium tax without application of the premium tax cap. Assume that a foreign insurer collects $500,000 of its premiums in New Jersey. Under the premium tax, the insurer's tax liability is 2.1% (applicable New Jersey tax rate) of $500,000, or $10,500. Application of the premium tax cap substantially lowers that tax obligation. Assume that the insurer's total worldwide premiums are $1,000,000 and that the insurer still receives $500,000 of its premiums from New Jersey business. Because the New Jersey premiums are more than 12.5% of the insurer's total worldwide premiums, the insurer qualifies for the premium tax cap. Pursuant to that cap, the insurer pays taxes on only 12.5% of its total worldwide premiums, that is, 12.5% of $1,000,000, or $125,000. The insurer's premium tax therefore is 2.1% of $125,000, or $2,625. Accordingly, through operation of the premium tax cap statute, the insurer saves $7,875—the difference between the uncapped tax of $10,500 and the capped tax of $2,625.

The operation of the retaliatory tax statute also is relatively straightforward. Assume that a foreign insurer's home state taxes insurance premiums at 2.5%. As stated, the rate in New Jersey is 2.1%. Consequently, excluding licensing fees and other related obligations, a foreign insurer operating in New Jersey pays taxes to New Jersey not only at the 2.1% rate, but the

foreign insurer also pays 0.4% in retaliatory tax, the difference between the New Jersey and foreign state rates.

Plaintiffs and the Director agree on the above calculations. They disagree, however, on the proper method of calculating retaliatory tax when the premium tax cap applies. According to the Director, the amount of retaliatory tax is determined by subtracting the premium tax cap amount from the retaliatory tax amount. For example, if we assume the same amounts as above, the Director calculates the retaliatory tax by multiplying the foreign tax rate by the insurer's New Jersey premiums, that is, 2.5% times $500,000, or $12,500. The Director then subtracts the premium tax cap amount from that total—$12,500 minus $2,625, or $9,875. The Director's justification for such an interpretation is that the premium tax cap effectively lowers New Jersey's 2.1% tax rate by allowing an insurer to pay taxes on only a portion of its actual premiums. For instance, in the above hypothetical, the Director reasons that the insurer is not paying taxes at a rate of 2.1%, but rather, because it only is taxed on $125,000 of its $500,000 of premiums, its effective rate of taxation is 0.525%. Therefore, the effective rate of taxation continually diminishes as an insurer conducts more of its business in the State, and the Director argues that that lower tax rate must be used to calculate the amount due in retaliatory tax.

The Director also claims that his interpretation is supported by the plain language of the statutes. The Director maintains that the two statutes must be applied independently of one another because "[n]either the premium-tax-reduction statute nor the retaliatory tax statute refers to the other and neither statute indicates that its purpose is secondary to the purpose of the other." Further, the retaliatory tax statute compares not only the rate of taxation between states in calculating the amount of retaliatory tax imposed on a foreign insurer, but also takes into account "any fees, fines, penalties, licenses, deposit requirements or other obligations," *N.J.S.A.* 17:32–15, that exist in New Jersey and the foreign state. Therefore, the Director argues that the

retaliatory tax must reflect the benefits of the premium tax cap as it is one such other obligation.

Conversely, plaintiffs argue that the benefits of the premium tax cap should be preserved when calculating retaliatory tax. Plaintiffs American Fire and West American contend that to calculate retaliatory tax an insurer should subtract the New Jersey tax rate (2.1%) from its home state tax rate (2.5%). The insurer is then responsible for the difference, that is, 0.4% of $500,000, or $2,000. Plaintiff Pruco Life offers a slightly different interpretation. As explained by Judge Payne in her well-reasoned opinion below:

> Whereas [American Fire and West American] utilize taxes on gross premiums as the basis for their computation, Pruco advocates a symmetrical comparison of its capped premiums as taxed in New Jersey and as theoretically taxed in its domiciliary State, thereby utilizing a net premium tax approach.
>
> [*American Fire & Cas. Co. v. New Jersey Div. of Taxation,* 375 *N.J.Super.* 434, 444, 868 *A.*2d 346 (App.Div.2005).]

The Appellate Division further noted that the plaintiff parties do not "directly oppose[ ] the view of the other." *Ibid.*

The difference between the Director and plaintiffs' approaches is significant. As stated, under both interpretations the insurer pays $2,625 in premium tax. Pursuant to the Director's method, the insurer also is responsible for $9,875 in retaliatory tax for a total tax obligation of $12,500. However, under plaintiffs' interpretation, the retaliatory tax amount is only $2,000, yielding a total tax obligation of $4,625. Therefore, the insurer pays $7,875 more in total taxes under the Director's interpretation. Further, when the Director's interpretation is applied to foreign insurers with home tax rates equal to or above 2.1%, any tax benefit that an insurer realizes through the premium tax cap is fully recovered by the State through the application of retaliatory tax. Under the Director's interpretation, although the insurer pays only $2,625 in New Jersey premium tax because of the premium tax cap, the Director's application of retaliatory tax raises the insurer's total tax obligation to $12,500, which is equal to the foreign state's rate (2.5% times $500,000). Therefore, a foreign insurer effectively receives no benefit from the premium tax cap. Finally, the

Director's method also has implications for foreign insurers domiciled in states with tax rates lower than New Jersey's. As explained by the Appellate Division:

> Under the Director's interpretation, a partial recapture of the premium tax cap would occur even if the state of domicile of the foreign insurer had a *lower* tax rate than that of New Jersey (assume 1.8%). Utilizing the prior example, the Director would calculate the tax payable in the domiciliary state as $500,000 (total New Jersey premiums) $\times$ 1.8% = $9,000–$2,625 (New Jersey tax as capped) = $6,375 in retaliatory taxation.
>
> ....
>
> ... The foreign insurer with a domiciliary rate of 1.8% loses $6,375, since it would not otherwise be subject to a retaliatory tax.
>
> [*Id.* at 443, 868 *A.*2d 346.]

## II.

This matter arises out of the tax returns filed by plaintiffs American Fire, Pruco Life, and West American.[2] Because the facts concerning these plaintiffs are not in dispute and are sufficiently similar, for brevity's sake we will discuss the facts regarding American Fire.

American Fire is incorporated in Ohio and is a member of the Ohio Casualty Corporation. According to the parties' joint stipulation of facts, in 2000, American Fire filed its initial 1999 tax return in which it listed an amount due of $228,890, including $14,405 in retaliatory tax. That return did not apply the premium tax cap as provided for by *N.J.S.A.* 54:18A–6, and the return indicated that American Fire was not entitled to a refund. Approximately one year later, American Fire filed an amended return in which it applied the premium tax cap. In that filing, American Fire restated its total tax due as $201,285 (again, including $14,405 in retaliatory tax) and claimed a refund "in the amount of $27,606 [sic]," which is the difference between the amount American Fire originally paid in total taxes ($228,890) and its restated tax obligation ($201,285). In both its initial and

---

2 According to the parties, only seven foreign insurance companies who avail themselves of the premium tax cap statute are also subject to the retaliatory tax.

amended returns, American Fire reported that its home state of Ohio would impose taxes amounting to $268,767.

One month later, the Commissioner provided the Director with an amended certification, stating that although American Fire qualified for the premium tax cap, the company's "[a]mended return show[ed] incorrect calculation for retaliatory" tax. The Commissioner explained that in American Fire's amended return, "12.5% is only on [the] NJ side and should be compared to domicile calculation." The Commissioner and the Division of Taxation (Division) then conducted a joint audit and, upon completion, informed American Fire: "While it is recognized and agreed that the taxpayer may limit the New Jersey liability to 12.5% of World Wide premiums, they [sic] may not reduce their tax due below that of their home state basis." Accordingly, after applying the premium tax cap, the Division rejected American Fire's claimed refund and determined that it owed $241,161. The Division also determined that American Fire was responsible for $27,606 in retaliatory taxes.

In response, American Fire filed a complaint with the Tax Court, challenging the Division's interpretation of the premium tax cap and retaliatory tax. The Tax Court consolidated American Fire's complaint with West American's complaint and ten other related appeals. Plaintiffs and the Division submitted a Stipulation of Facts, and both moved for summary judgment. In that stipulation, the parties agreed that, at the time of the filing of this appeal, neither the Department of Banking and Insurance nor the Division had internal written policies for calculating retaliatory tax when a taxpayer also claimed the benefit of the premium tax cap.

The Tax Court granted defendant's motion for summary judgment and denied that of plaintiffs. *American Fire & Cas. Co. v. Dir., Div. of Taxation*, 21 *N.J. Tax* 155, 177 (2003). The Tax Court determined that the "history of the cap and retaliatory tax statutes suggests that neither statute should affect the interpretation of the other." *Id.* at 166. The court also found that the Director's interpretation of the retaliatory tax statute is constitu-

tional because it furthers the legitimate purpose of "influencing the tax burden imposed by foreign states on New Jersey insurers" and that the "Legislature reasonably could have believed that the tax, as so calculated, could achieve" that purpose. *Id.* at 175–76. In a separate case, the court also rejected Pruco Life's complaint in which, in addition to the arguments advanced by American Fire and West American, it argued that the Director had violated the APA by engaging in de facto rulemaking. All three insurers appealed to the Appellate Division.

The Appellate Division consolidated the cases and reversed the Tax Court decisions. *American Fire, supra,* 375 *N.J.Super.* 434, 868 *A.*2d 346. In a published opinion, the court rejected the Director's interpretation because it found that "the statutes at issue can be jointly applied so as to give effect to the language and purpose of each." *Id.* at 449, 868 *A.*2d 346. The panel reasoned that the Director's interpretation does not fulfill "the stated purpose of the retaliatory tax statute" because it "subverts its use as a tax equalization mechanism." *Id.* at 454, 868 *A.*2d 346. The court further reasoned that the Director's construction nullifies the purpose of the premium tax cap because "it removes any incentive on the part of a foreign insurer to write a substantial amount of its business and otherwise invest in the economy of this State." *Ibid.* The panel also held that the Director's approach is unconstitutional under the Equal Protection Clause because it has "no legitimate purpose." *Id.* at 462, 868 *A.*2d 346. Given its disposition on those issues, the panel did not consider Pruco Life's APA claim. *Ibid.* We granted the Director's petition for certification. 183 *N.J.* 591, 874 *A.*2d 1109 (2005).

### III.

The primary issue on this appeal is the proper method of calculating a foreign insurer's retaliatory tax obligation under *N.J.S.A.* 17:32–15 when the premium tax cap statute, *N.J.S.A.* 54:18A–6, applies to the insurer. In resolving that issue, we first must address the appropriate standard of review. Our initial

reference point is the principle of deference which applies to administrative policymaking and fact-finding, but "to a lesser extent to statutory interpretation of an agency." *In re Distrib. of Liquid Assets Upon Dissolution of the Union County Reg'l High Sch. Dist. No. 1*, 168 *N.J.* 1, 10–11, 773 *A.*2d 6 (2001). In this appeal, the core question is one of statutory interpretation. This Court has stated that "[a]n appellate tribunal is . . . in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." *Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). Therefore, the Director's interpretation of the statutes presented in the instant matter, which is "a strictly legal issue," has limited value and is not binding on this Court.

Moreover, "because tax liability is established by way of revenue legislation, all the rules of statutory construction are relevant." *Stryker Corp. v. Dir., Div. of Taxation*, 168 *N.J.* 138, 155, 773 *A.*2d 674 (2001) (internal quotation marks omitted). As Justice Albin recently explained:

> The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language. We ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole. It is not the function of this Court to rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language. We cannot write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment, or engage in conjecture or surmise which will circumvent the plain meaning of the act. *Our duty is to construe and apply the statute as enacted.*
>
> A court should not resort to extrinsic interpretive aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation. . . . On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction. *We may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language.* [*DiProspero v. Penn*, 183 *N.J.* 477, 492–93, 874 *A.*2d 1039 (2005) (emphasis added) (internal quotation marks and citations omitted).]

Finally, when the Court reviews two separate but related statutes, the goal is to harmonize the statutes in light of their

purposes. *St. Peter's Univ. Hosp. v. Lacy*, 185 *N.J.* 1, 14, 878 *A.*2d 829 (2005) ("When reviewing two separate enactments, the Court has an affirmative duty to reconcile them, so as to give effect to both expressions of the lawmakers' will." (quoting *In re Adoption of a Child by W.P. & M.P.*, 163 *N.J.* 158, 182, 748 *A.*2d 515 (2000) (Poritz, C.J., dissenting) (citations omitted))); *ibid.* ("[O]ur duty is clear: 'When interpreting different statutory provisions, we are obligated to make every effort to harmonize them....'" (quoting *In re Gray–Sadler*, 164 *N.J.* 468, 485, 753 *A.*2d 1101 (2000) (citing *State v. Federanko*, 26 *N.J.* 119, 130, 139 *A.*2d 30 (1958)))). Indeed, "'[s]tatutes that deal with the same matter or subject should be read in *pari materia* and construed together as a unitary and harmonious whole.'" *Id.* at 14–15, 878 *A.*2d 829 (quoting *W.P., supra*, 163 *N.J.* at 182, 748 *A.*2d 515 (Poritz, C.J., dissenting) (citation, footnote, and internal quotation marks omitted)).

Finally, we note that the premium tax cap statute is unique to New Jersey, and, therefore, the law of other states does not provide meaningful guidance in this appeal. The lack of binding precedent in this State or persuasive precedent in other states underscores our responsibility to reconcile the statutes, if possible.

## IV.

In light of those principles of statutory construction, we first examine the plain language of the statutes to determine what effect, if any, the retaliatory tax statute has on the tax benefits afforded to insurers under the premium tax cap. That statute provides that a retaliatory tax will be assessed

> [w]hen by the laws of any other state ... any premium or income or other taxes, or any fees, fines, penalties, licenses, deposit requirements or other obligations, prohibitions or restrictions are imposed upon New Jersey insurance companies ... doing business in such other state, ... *which are in excess of such taxes, fees, fines, penalties, licenses, deposit requirements or other obligations, prohibitions or restrictions imposed upon insurance companies ... doing business in New Jersey*
> ....

[*N.J.S.A.* 17:32–15 (emphasis added).]

We therefore must determine whether the premium tax cap statute is part of the "taxes, fees, fines, penalties, licenses, deposit requirements or other obligations ... imposed upon insurance companies ... doing business in New Jersey" pursuant to the retaliatory tax statute. *Ibid.* Although a plain reading might suggest that the premium tax cap is part of the landscape of tax liability described by *N.J.S.A.* 17:32–15, we decline to adopt the Director's plain reading interpretation of the retaliatory tax statute that applies the two statutes independently of one another. That interpretation leads to an unreasonable result that the Legislature could not have intended.

This Court has "an affirmative duty" when construing two statutory provisions relating to the same subject matter to "reconcile them, so as to give effect to both expressions of the lawmakers' will." *St. Peter's, supra,* 185 *N.J.* at 14, 878 *A.*2d 829. Further, we must construe statutes in a manner that avoids unreasonable results unintended by the Legislature. *See, e.g., State v. Lewis,* 185 *N.J.* 363, 369, 886 *A.*2d 643 (2005) ("[A] court should strive to avoid statutory interpretations that lead to absurd or unreasonable results.") (citation and quotation omitted).

The purpose of the premium tax cap statute is to encourage insurers to conduct more business within the State. State-ment to Senate Bill No. 2995 ("The limitation of the maximum amount of premium tax payable was intended to be available to those insurance companies, domestic or foreign, which make a substantial commitment to New Jersey and contribution to its economy. . . ."). Although the State loses a source of tax revenue through application of the cap, the Legislature's goal in enacting the cap is to enable the State to receive the long-term benefit of increased investment. Among other desired effects, such investment may lead to new jobs, new office buildings, and collateral benefits for other New Jersey businesses that service insurance companies, such as lawyers and accountants. *Ibid.* Further, the tax revenue that such investments generate through property tax,

income tax, and sales tax is expected to more than compensate for any lost revenue under the premium tax cap.

In contrast, the purpose of the retaliatory tax statute is "to protect [New Jersey] domestic insurance companies from the imposition by a sister state of taxes or other costs of doing business which exceed the costs of doing business in the domiciliary state." *Employers' Fire, supra,* 6 *N.J. Tax* at 615. In enacting the statute, "the Legislature sought to impose the same burden on an out-of-state insurer doing business here as is imposed on New Jersey insurers doing business in the home state of the out-of-state insurer. Equality or even-handed treatment is clearly the legislative purpose." *Ibid.* Therefore, a proper interpretation of the two statutes must ensure both that the premium tax cap statute encourages insurers to conduct more business in this State and that the retaliatory tax statute operates to promote "even-handed treatment" from sister states in their application of tax laws to New Jersey insurers.

The Director's interpretation does not achieve those results. First, under the Director's interpretation, the premium tax cap provides no incentive for foreign insurers to conduct business in the State because the retaliatory tax fully recaptures any benefit provided by the premium tax cap. Indeed, the Director's application of the retaliatory tax completely eviscerates the premium tax cap because a foreign insurer's tax liability in New Jersey always will be equal to the insurer's hypothetical tax liability in its home state. Under such a construct, the premium tax cap statute is relegated to mere surplusage as applied to such insurers. In that respect, although we note that "[t]he Legislature is presumed to be familiar with its own enactments," *Federanko, supra,* 26 *N.J.* at 129, 139 *A.2d* 30, it is incongruous to find, as the Director urges, that the Legislature enacted the premium tax cap statute in 1945, but only five years later silently rendered it useless to foreign insurers when it enacted the retaliatory tax statute in 1950. If the Legislature intended such a result, then it could have amended the

premium tax cap statute in 1950 or, for that matter, at any point in the intervening half-century.

The Director's interpretation also fails to promote the retaliatory tax statute's purpose of encouraging "even-handed treatment" of insurers between states. As the Appellate Division noted, because the Director utilizes an effective rate of taxation in calculating retaliatory tax, foreign insurers benefiting from the cap who hail from states with a lower tax rate than New Jersey's stated rate of 2.1% would still pay retaliatory tax if New Jersey's effective tax rate is lower than the insurer's home state tax rate. *American Fire, supra,* 375 *N.J.Super.* at 443, 868 *A.*2d 346 ("Under the Director's interpretation, a partial recapture of the premium tax cap would occur even if the state of domicile of the foreign insurer had a *lower* tax rate than that of New Jersey."). Applying the retaliatory tax in that manner could lead to a downward spiral of tax rates because, to exempt their insurers from paying retaliatory tax in New Jersey, states would have to match New Jersey's effective rate of taxation by enacting significantly lower premium tax rates. For example, if a foreign insurer had worldwide premiums of $1,000,000 of which $800,000 were from New Jersey business, under the premium tax cap, the foreign insurer would be taxed at a 0.328% effective rate. If other states reduced their insurance tax rates to such an extent, then, as previously noted, insurers would have no incentive to invest in New Jersey because the tax rate would be equally low nationwide. Under the Director's application of retaliatory tax, foreign states are forced to match that 0.328% rate, thereby all but eliminating the premium tax. We find it difficult to imagine that the Legislature intended such results when it enacted the premium tax cap and the retaliatory tax statutes.

Additionally, because it is unlikely that other states would significantly reduce their premium tax rates, it becomes evident that the Director's application of retaliatory tax is not intended to "apply pressure on other States to maintain low taxes on [New Jersey] insurers," *Western & Southern, supra,* 451 *U.S* at 669–70,

101 *S.Ct.* at 2084, 68 *L.Ed.*2d at 531, but rather, is intended to generate revenue. Although we need not decide this matter on constitutional grounds, it suffices to note that such a construct would raise significant constitutional questions. *See ibid.* (concluding that application of retaliatory tax statute to generate revenue at expense of out-of-state insurers would be unconstitutional).

In sum, our analysis of the statutes and their respective legislative underpinnings persuades us that the tax benefits of the premium tax cap afforded to foreign insurers should not be included in calculating the retaliatory tax. In reaching that conclusion, we reiterate our obligation to harmonize, if possible, different statutory provisions. We therefore conclude that plaintiffs' methodology, which preserves the benefit of the premium tax cap, properly furthers the purposes of both statutes. That interpretation effectuates the intent of the retaliatory tax statute by deterring other states from enacting discriminatory taxes that are above New Jersey's stated tax rate of 2.1%. To the extent that a state imposes a higher tax rate, thus subjecting New Jersey insurers operating in that state to a higher tax burden, foreign insurers from that state operating in New Jersey must pay retaliatory tax based on the rate difference. Moreover, plaintiffs' interpretation furthers the purpose of the premium tax cap statute because the retaliatory tax does not fully recapture the benefits afforded to an insurer by the premium tax cap. Therefore, foreign insurers are still encouraged to conduct more business in New Jersey because, once the statutory threshold is met, they will enjoy significant tax benefits.

In view of our disposition, we need not reach plaintiffs' remaining arguments.

## V.

In reaching our conclusion, we have sought to discern the underlying purposes of the legislation and to harmonize the statutes at issue. In doing so, we recognize that there are competing

considerations involving both tax policies and economic interests in this State. However, our responsibility is not to determine which policies should prevail, but rather, to reconcile the statutes in dispute. If the Legislature disagrees with our harmonization of the enactments in question, then, with appropriate executive branch input, it may examine this issue and amend the statutes as it sees fit.

For the foregoing reasons, we affirm the judgment of the Appellate Division on statutory grounds and instruct the Director of the Division of Taxation to recalculate refunds due to plaintiffs in accordance with the principles set forth in this opinion.

Justice RIVERA–SOTO, dissenting.

This appeal requires an examination of the methodology used by the Director of the Division of Taxation (Director) in applying this State's taxing scheme on foreign insurers doing business in New Jersey. Specifically, as the majority properly observes, our task in this appeal is to "determine the proper relationship between the State's retaliatory tax statute, *N.J.S.A.* 17:32–15, 17B:23–5, and its premium tax cap statute, *N.J.S.A.* 54:18A–6(a)." *Ante,* 189 *N.J.* at 69, 912 *A.*2d at 128 (2006). Harmonizing these two statutes, the Director computed the retaliatory tax to which these foreign insurers were subject while also giving effect to New Jersey's 12.5% premium tax cap. The net effect of the Director's actions was to create a level playing field and place New Jersey insurers on an equal footing with foreign insurers: foreign insurers are to be taxed in the same manner as New Jersey insurers would be taxed by the foreign insurers' home state if the New Jersey insurer earned premiums in the foreign state.

In those circumstances, our duty is long-standing and clear: "the Director's expertise, particularly when exercised in the specialized and complex area covered by [taxing statutes] is entitled to great respect by the courts. Moreover, the agency's interpretation of the operative law is entitled to prevail, as long as it is not plainly unreasonable." *Metromedia, Inc. v. Dir., Div. of Taxa-*

*tion,* 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984) (citations omitted). *See also In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 415, 441, 852 *A.*2d 167 (2004) (same); *Kasper v. Bd. of Trs. of the Teachers' Pension & Annuity Fund,* 164 *N.J.* 564, 581, 754 *A.*2d 525 (2000) (" 'To uphold an agency's construction of a statute that is silent or ambiguous with respect to the question at issue, a reviewing court need not conclude that the agency construction was the only one it permissibly could have adopted, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.' " (quoting 2 *Am.Jur.2d Admin. Law* § 525 (1994) (footnotes omitted))). Applying those well-settled principles, the majority's logic cannot sustain the requisite conclusion that the Director's means of harmonizing the premium tax cap and retaliatory tax statutes is "plainly unreasonable."

Consistent with our obligations, the majority acknowledges that "the Director has interpreted the two statutes based on a plain reading of their language[,]" *ante,* 189 *N.J.* at 72–73, 912 *A.*2d at 131 (2006), a conclusion in which the Tax Court concurred. *Am. Fire & Cas. Co. v. N.J. Div. of Taxation,* 21 *N.J. Tax* 155, 162–74 (2003). Nevertheless, eschewing that reasoned and reasonable conclusion, the majority rejects the Director's position, preferring instead to "adopt plaintiffs' methodology[,]" *ante,* 189 *N.J.* at 73, 912 *A.*2d at 131 (2006), a methodology based on the majority's independent judgment—one contrary to the judgment reached by the Director and consistent with the arguments advanced by plaintiffs—that "the benefits of the premium tax cap should be preserved when calculating [the] retaliatory tax." *Ante,* 189 *N.J.* at 75, 912 *A.*2d at 132 (2006).

I respectfully disagree. In my view, the better and more balanced approach is the one so ably adopted by Tax Court Judge Kuskin, who granted summary judgment in favor of the State, and held that "[t]he history of the [premium tax] cap and retaliatory tax statutes suggests that neither statute should affect the interpretation of the other." *Am. Fire & Cas. Co. v. N.J. Div. of Taxation, supra,* 21 *N.J. Tax* at 166. Instead, as Judge Kuskin

correctly noted, a complete review of the legislative history of these two statutes "suggest[s] a legislative intent to have the [premium tax] cap statute and retaliatory tax statute function in the manner adopted by the Director." *Id.* at 167. Judge Kuskin captured the issue clearly and succinctly:

> Plaintiffs' policy arguments and the analyses by their experts are logical, sensible, and appealing. However, my responsibility is not to interpret the [premium tax] cap and retaliatory tax statutes based on my notions of appropriate policy, but to interpret the statutes based on my analysis of legislative intent. The judiciary has no power to devise tax programs or to qualify the existing legislative mandate with a judge's private view of what is just or sensible. If the Legislature has made a bad policy judgment in requiring that the [premium tax] cap be applied in calculating retaliatory tax, that is the Legislature's prerogative, as it is the Legislature's prerogative to amend the [premium tax] cap and retaliatory tax statutes if it wishes.
>
> [*Id.* at 172 (citations and internal quotation marks omitted).]

That clear reasoning is compelled by the fact that the matter before us is closely poised. Thus, we should refrain from interposing our judgment in respect of the wisdom of the Director's methodology for assessing both the premium tax cap and the retaliatory tax on foreign insurance carriers. In its stead, we should reverse the determination of the Appellate Division and reinstate the judgment of the Tax Court.

I, therefore, respectfully dissent.

Justices ALBIN and WALLACE join in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA and ZAZZALI—4.

*For reversal*—Justices ALBIN, WALLACE and RIVERA–SOTO—3.