NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3384-18T3

MARK AMZLER,

 Plaintiff-Respondent,

v.

AMY AMZLER,

 Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

April 2, 2020

APPELLATE DIVISION

Argued January 6, 2020 – Decided April 2, 2020

Before Judges Rothstadt, Moynihan[1] and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FM-12-2131-09.

Samuel J. Berse argued the cause for appellant (Berse Law, LLC, attorneys; Samuel J. Berse, on the briefs).

Rebecca A. Hand argued the cause for respondent (Cosner Youngelson, attorneys; Rebecca A. Hand, on the brief).

The opinion of the court was delivered by

MITTERHOFF, J.A.D.

---

[1] Judge Moynihan did not participate in oral argument. He joins the opinion with the consent of the parties. R. 2:13-2(b).

Defendant Amy Amzler appeals from a March 20, 2019 order denying her motion for reconsideration and the underlying September 25, 2018 order, which terminated plaintiff Mark Amzler's alimony obligation. In 2009, the parties executed a matrimonial settlement agreement (MSA) that required plaintiff to pay defendant alimony. The parties agreed to an anti-Lepis[2] provision, which stated that a "voluntary reduction in income of either party" would not constitute a substantial change in circumstances for the purpose of reviewing the alimony obligation. After the parties divorced, plaintiff continued working, but he later retired before reaching full retirement age due to medical issues. Defendant filed a motion to enforce plaintiff's alimony obligation and to compel him to maintain and provide proof of his life insurance policy, as required under the MSA. Plaintiff opposed the motion and filed a cross-motion seeking to modify or terminate his alimony obligation. The judge denied defendant's motion and granted plaintiff's cross-motion to terminate plaintiff's alimony obligation. Defendant filed a motion for reconsideration, but the judge denied her motion.

In reaching his decisions, the judge relied on N.J.S.A. 2A:34-23(j)(2), which governs the review of alimony awards where the obligor retires before reaching the full retirement age. Defendant argues that the judge incorrectly

---

[2] Lepis v. Lepis, 83 N.J. 139 (1980).

applied N.J.S.A. 2A:34-23(j)(2), rather than N.J.S.A. 2A:34-23(j)(3), which governs the review of final alimony orders or agreements established before the effective date of the 2014 amendments to the alimony statute.

Having considered the Legislature's intent in amending the statute, and as a matter of first impression, we agree with defendant that N.J.S.A. 2A:34-23(j)(2) applies only to orders or agreements established after the effective date of the 2014 amendments and that N.J.S.A. 2A:34-23(j)(3) governs this case. We also note that the judge did not consider whether plaintiff's early retirement was a voluntary reduction of his income subject to the MSA's anti-Lepis provision, in light of the fact that it was undisputed that, based on plaintiff's vocational expert's opinion, when plaintiff retired he was still capable of working, albeit at a different job. Accordingly, we vacate the September 25, 2018 order terminating alimony, reverse the March 20, 2019 order denying reconsideration, and remand the matter for consideration of whether termination or modification of plaintiff's alimony obligation is appropriate under N.J.S.A. 2A:34-23(j)(3), and if so, whether the anti-Lepis provision prohibits a termination or reduction of plaintiff's alimony obligation.

We discern the following facts from the record. Plaintiff and defendant were married in June 1986. The following year, plaintiff began working at

Public Service Electric & Gas (PSE&G) as a chief underground technician, where he performed supervisory tasks as well as field work, including "ascending and descending ladders to install and repair underground cables and transformers using a variety of hand tools."

After several years of marriage, in May 2009, plaintiff filed a complaint for divorce. The parties executed an MSA, effective December 15, 2009, and they were divorced on January 4, 2010. The MSA settled "all of the rights and obligations involving equitable distribution of all their joint and individual property." With respect to retirement accounts and investments, plaintiff executed a qualified domestic relations order granting defendant the right to half of plaintiff's PSE&G 401k and a portion of plaintiff's PSE&G pension benefit.

The MSA further provided that plaintiff would pay defendant permanent alimony of $21,600.28 per year, or $415.39 per week, which was "premised upon [plaintiff] earning $110,000[] per year and the imputation of income to [defendant] in the amount of $35,000[] per year." When the parties agreed to these terms, defendant was earning $16,896 per year, but she had recently applied for a position in which she would earn $35,000 per year if she passed a test. The alimony obligation could be reviewed upon a substantial change in circumstances, but the parties agreed to an anti-Lepis provision, so certain

4

events would not constitute such a change: "1) [t]he voluntary reduction in income of either party; 2) [a]ny voluntary increase or decrease in each party's cost of living; [and] 3) [t]he dissipation of the assets received by either party as and for equitable distribution." (Emphasis added).

The MSA also required plaintiff to maintain a life insurance policy on his life, naming defendant as the beneficiary. Plaintiff was required to maintain the policy "regardless of the alimony obligation, to ensure and protect [defendant's] . . . [fifty percent] interest in the marital portion of [plaintiff's] pension." He was further required to "provide proof of the continued existence and maintenance of the policy" on an annual basis, and defendant was permitted "to periodically confirm [the policy's] continued existence."

After the parties divorced, plaintiff continued working as a chief underground technician at PSE&G, and on the early unreduced retirement date of January 12, 2013, he declined to retire in order to recover the money he "lost in the divorce." He eventually retired in July 2017, at the age of fifty-nine, at which point he was entitled to full retirement benefits of $5164.37 per month through his PSE&G pension. Of this amount, plaintiff received $3285.11,[3] and

---

[3] Plaintiff also received an additional payment of $124 each month, to continue until he reached sixty-two years of age. This amount was not included in the total pension benefit referenced above.

A-3384-18T3

defendant received $808.93. Neither party knew why the remaining $1070.33 was not paid to either of them.

Following plaintiff's retirement, defendant filed a motion to enforce the MSA's alimony provision, to adjudicate plaintiff to be in violation of litigant's rights for failure to pay alimony, and to compel plaintiff to continue to maintain and provide proof of the life insurance policy. Plaintiff opposed the motion, certifying that he was current on his obligation and that he continued to maintain the policy. He included copies of the policy declaration page, the beneficiary information page, and his pension statement showing a deduction for the policy premium.

Plaintiff also filed a cross-motion to modify or terminate the alimony obligation, claiming that he retired from PSE&G in good faith due to medical problems that precluded him from performing the tasks required by his job. On November 27, 2017, the judge issued an order reserving his decision on the alimony matter pending the outcome of a plenary hearing and granting defendant's request to require plaintiff to maintain and provide proof of the life insurance policy.

To prepare for the plenary hearing, plaintiff met with Gary Young, a certified forensic vocational counselor, who was tasked with evaluating

plaintiff's ability to work.  During their meeting, plaintiff provided Young with his medical records.  In a May 22, 2017 report, Dr. Todd McGrath of Aria – 3B Orthopaedics noted that plaintiff suffered from "left knee pain, left knee degenerative joint disease[,] . . . [and] bilateral hand swelling and achiness" but found that plaintiff was doing well while taking glucosamine.  Dr. McGrath further noted that plaintiff was scheduled to see a rheumatologist.

In a December 18, 2017 report, plaintiff's rheumatologist, Dr. Jill Johnson of Arthritis Group, noted that plaintiff's "knee pain prevents him from climbing type movements . . . required to get in and out of his truck or to climb a ladder" and that "[h]is hand, shoulder and elbow pain make it difficult for him to use both standard hand tools . . . as well as power equipment or heavy machinery." Dr. Johnson also noted that plaintiff "has difficulty tolerating exposure to extremes of temperature" and that his pain prevents him from sitting for more than twenty-five to thirty minutes and standing or walking for more than ten to fifteen minutes.

On April 2, 2018, the judge held a plenary hearing and heard testimony from Young, plaintiff, and defendant.

Young testified as a vocational expert.  He opined that at sixty years old, plaintiff was "a person of advanced age," which "limits [his] vocational future."

A-3384-18T3

He also noted that plaintiff had graduated from high school and had neither pursued advanced education nor received any certifications. He had researched plaintiff's job in the dictionary of occupational titles and found that the responsibilities of a chief underground technician were comparable to those of a lineman, a labor-intensive position. He determined that plaintiff's difficulty using a ladder was "the first thing that . . . would prevent [him] from doing [his] job." Considering plaintiff's vocational background, medical history, and financial position, Young opined that "it made no sense for him to continue doing . . . lineman work," and he concluded that plaintiff retired in good faith.

When the judge asked Young whether plaintiff could work in a different job, Young opined that appropriate alternatives might include employment as a security guard or automobile parts delivery person, both of which would allow for some freedom of movement. While these jobs could provide full-time employment, they offered lower pay and likely would not provide health or retirement benefits. When the judge inquired about whether plaintiff could transfer to another job within PSE&G, Young explained that plaintiff was not qualified for the more sedentary positions, and there were few, if any, open training positions. However, Young acknowledged that plaintiff had not actually applied for a transfer.

Next, plaintiff testified about his responsibilities as a chief underground technician and explained that he retired because of "[s]torm trouble" and physical pain that caused difficulties with his job. He explained that he chose not to apply for disability benefits because both he and defendant would receive more money if he retired instead. He then testified about his medical history and read Dr. Johnson's report into the record.

Regarding the issue of retirement, plaintiff testified that during the parties' marriage, they contemplated plaintiff retiring at the age of fifty-five. The expected age of retirement for PSE&G employees in his position was 59.5 years of age, and many people in his position did not work into their late sixties because of the demanding work. Plaintiff testified that he had looked for alternate work three or four times but found that all the positions for which he was qualified required physical labor that he could not perform without pain or injury. He also explained that PSE&G's training facility was going to be closed, and there were no plans to open a new one.

Based on plaintiff's pension payment and his living expenses, he testified that he was unable to continue paying alimony. Although he had previously tried to supplement his pension income by investing in a food truck business, he

had to sell his interest to maintain his standard of living while continuing to meet his alimony obligation.

Finally, the judge heard from defendant. She testified that her current salary was $43,680 and that she had a retirement account through her current employer worth $27,466.37, as of two months before the hearing. She had received a portion of plaintiff's 401k, pursuant to the MSA, and her portion was now valued at $257,220.86. Additionally, she received a pension payment of $808 per month due to plaintiff's retirement. Defendant testified that she did not anticipate retiring soon and would probably work for another thirteen years. Ultimately, she was concerned that she would not be able to live solely on her earnings, plaintiff's 401k, and plaintiff's pension.

The judge issued an oral decision on September 12, 2018. Applying the factors under N.J.S.A. 2A:34-23(j)(2) and considering testimony from the plenary hearing, especially the reports about plaintiff's physical condition, the judge found that plaintiff had retired in good faith. Thus, he terminated plaintiff's alimony obligation, effective September 25, 2018.

On October 22, 2018, defendant filed a motion for reconsideration, contending that the judge erred in (1) applying N.J.S.A. 2A:34-23(j)(2) rather than N.J.S.A. 2A:34-23(j)(3), (2) admitting hearsay by allowing testimony as to

the contents of plaintiff's medical records, (3) admitting a net opinion by allowing Young's expert testimony, and (4) making various factual findings. Additionally, defendant again requested that plaintiff be required to maintain the insurance policy required by the MSA.

The judge heard oral argument on February 12, 2019 and denied defendant's motion in a written order on March 20, 2019. He concluded that he had correctly applied N.J.S.A. 2A:34-23(j)(2) and determined that he had not erred in admitting plaintiff's medical records and Young's testimony because defendant acquiesced to the admission of each during the hearing. Finally, he concluded that the remaining alleged errors concerned factual and credibility findings, and he had properly exercised his discretion to make such findings. This appeal ensued.

On appeal, defendant contends that the judge made the following errors: he applied N.J.S.A. 2A:34-23(j)(2) rather than N.J.S.A. 2A:34-23(j)(3); he ignored several facts in the record; and he failed to consider the request to compel plaintiff to provide proof of the life insurance policy.[4]

_____

[4] In her appellate brief, defendant also argued that the judge erred in admitting hearsay when he allowed testimony as to the contents of plaintiff's medical records and in admitting a net opinion when he allowed Young to testify as an expert about whether plaintiff retired in good faith. During oral argument on

We review questions of law, including the issue of statutory interpretation, de novo. McGovern v. Rutgers, 211 N.J. 94, 108 (2012). Likewise, we review the interpretation of a matrimonial settlement agreement de novo. See Quinn v. Quinn, 225 N.J. 34, 45 (2016); Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011) (citing Jennings v. Pinto, 5 N.J. 562, 569-70 (1950)). We are, however, bound by a trial judge's factual findings if they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Reversal is warranted only if the findings were "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms, 65 N.J. at 484.

We begin by reviewing the relevant statutory framework. A judge may award alimony "as the circumstances of the parties and the nature of the case

January 6, 2020, defendant advised the court that she does not contest Young's opinion that plaintiff's medical problems preclude him from working as a chief underground technician. Based on this concession, defendant has abandoned her contentions regarding the admission of hearsay and a net opinion.

shall render fit, reasonable and just," and an alimony order "may be revised and altered by the court from time to time as circumstances may require." N.J.S.A. 2A:34-23. In 2014, our Legislature amended the alimony statute. Before the amendments, a party seeking to modify an alimony obligation was required to "demonstrate that changed circumstances have substantially impaired the ability to support himself or herself." Landers v. Landers, 444 N.J. Super. 315, 320 (App. Div. 2016) (quoting Lepis, 83 N.J. at 157). The amendments included the addition of subsection (j), which now governs the modification or termination of an alimony obligation "upon the prospective or actual retirement of the obligor." N.J.S.A. 2A:34-23(j). Subsection (j) includes three provisions, and in deciding to terminate plaintiff's alimony obligation, the judge applied subsection (j)(2).

In pertinent part, subsections (j)(2) and (j)(3) provide the following:

> Alimony may be modified or terminated upon the prospective or actual retirement of the obligor.
>
> . . . .
>
> (2) Where the obligor seeks to retire prior to attaining the full retirement age . . . the obligor shall have the burden of demonstrating by a preponderance of the evidence that the prospective or actual retirement is reasonable and made in good faith. . . .

In order to determine whether the obligor has met the burden of demonstrating that the obligor's prospective or actual retirement is reasonable and made in good faith, the court shall consider the following factors:

(a) [t]he age and health of the parties at the time of the application;

(b) [t]he obligor's field of employment and the generally accepted age of retirement for those in that field;

(c) [t]he age when the obligor becomes eligible for retirement at the obligor's place of employment, including mandatory retirement dates or the dates upon which continued employment would no longer increase retirement benefits;

(d) [t]he obligor's motives in retiring, including any pressures to retire applied by the obligor's employer or incentive plans offered by the obligor's employer;

(e) [t]he reasonable expectations of the parties regarding retirement during the marriage or civil union and at the time of the divorce or dissolution;

(f) [t]he ability of the obligor to maintain support payments following retirement, including whether the obligor will continue to be employed part-time or work reduced hours;

(g) [t]he obligee's level of financial independence and the financial impact of the obligor's retirement upon the obligee; and

(h) [a]ny other relevant factors affecting the obligor's decision to retire and the parties' respective financial positions.

14

If the obligor intends to retire but has not yet retired, the court shall establish the conditions under which the modification or termination of alimony will be effective.

(3) When a retirement application is filed in cases in which there is an existing final alimony order or enforceable written agreement established prior to the effective date of this act, the obligor's reaching full retirement age as defined in this section shall be deemed a good faith retirement age. . . . In making its determination, the court shall consider the ability of the obligee to have saved adequately for retirement as well as the following factors in order to determine whether the obligor, by a preponderance of the evidence, has demonstrated that modification or termination of alimony is appropriate:

(a) [t]he age and health of the parties at the time of the application;

(b) [t]he obligor's field of employment and the generally accepted age of retirement for those in that field;

(c) [t]he age when the obligor becomes eligible for retirement at the obligor's place of employment, including mandatory retirement dates or the dates upon which continued employment would no longer increase retirement benefits;

(d) [t]he obligor's motives in retiring, including any pressures to retire applied by the obligor's employer or incentive plans offered by the obligor's employer;

(e) [t]he reasonable expectations of the parties regarding retirement during the marriage or civil union and at the time of the divorce or dissolution;

(f) [t]he ability of the obligor to maintain support payments following retirement, including whether the obligor will continue to be employed part-time or work reduced hours;

(g) [t]he obligee's level of financial independence and the financial impact of the obligor's retirement upon the obligee; and

(h) [a]ny other relevant factors affecting the parties' respective financial positions.

We have not previously had the occasion to address whether subsection (j)(2) applies to all cases in which a party retires before full retirement age, or only those cases in which an MSA was executed after the 2014 amendments to the alimony statute.

When we interpret a statute, we consider the Legislature's intent in enacting the statute. DiProspero v. Penn, 183 N.J. 477, 492 (2005). We begin by examining the statute's plain language, Patel v. N.J. Motor Vehicle Comm'n, 200 N.J. 413, 418 (2009), and we consider the three (j) subsections "together as a unitary and harmonious whole," Landers, 444 N.J. Super. at 324 (quoting Am. Fire & Cas. Co. v. N.J. Div. of Taxation, 189 N.J. 65, 80 (2006)). When statutes appear to conflict, we have "an affirmative duty to reconcile them, so as to give

16                                                                    A-3384-18T3

effect to both expressions of the lawmakers' will." Saint Peter's Univ. Hosp. v. Lacy, 185 N.J. 1, 14-15 (2005) (quoting In re Adoption of a Child by W.P. & M.P., 163 N.J. 158, 182-83 (2000) (Poritz, C.J., dissenting)).

Subsection (j)(3) plainly states that it applies to matters "in which there is an existing final alimony order or enforceable written agreement established prior to the effective date of this act." N.J.S.A. 2A:34-23(j)(3). In Landers, 444 N.J. Super. at 323, we determined that "[t]his purposeful design demonstrates an intent to address such circumstances somewhat differently than orders entered following the enactment of the statutory amendments." Notably, neither subsection (j)(1) nor subsection (j)(2) includes similar language.

Consequently, in Landers, we considered the circumstances under which subsection (j)(1) should be applied. Id. at 324. In construing subsection (j), we held that although subsection (j)(1) does not explicitly state that it refers to orders or agreements established after the 2014 amendments, "the particular language used in subsection (j)(3) clarifies the Legislature's intent to apply (j)(1) only to orders entered after the amendments' effective date." Ibid. In reaching this conclusion, we considered a provision included in the legislation:

> This act shall take effect immediately and shall not be construed either to modify the duration of alimony ordered or agreed upon or other specifically bargained

A-3384-18T3

for contractual provisions that have been incorporated into:
   a. a final judgment of divorce or dissolution;
   b. a final order that has concluded post-judgment litigation; or
   c. any enforceable written agreement between the parties.

[L. 2014, c. 42 § 2.]

We acknowledged that "[t]his additional statement signals the legislative recognition of the need to uphold prior agreements executed or final orders filed before adoption of the statutory amendments." Landers, 444 N.J. Super. at 323 (quoting Spangenberg v. Kolakowski, 442 N.J. Super. 529, 538 (App. Div. 2015)). We also identified conflicting provisions in subsections (j)(1) and (j)(3), which demonstrates that the Legislature intended to apply a different standard to pre-amendment orders or agreements. We declined to address subsection (j)(2) because Landers involved an obligor who sought termination of his alimony obligation after he had reached the full retirement age. Id. at 317, 322.

We now consider subsection (j)(2). Like subsection (j)(1), when read in isolation, subsection (j)(2) appears to apply regardless of whether the order or agreement creating an alimony obligation was established before or after the 2014 amendments. See N.J.S.A. 2A:34-23(j)(2). However, when construed with the entirety of subsection (j), as in Landers, we conclude that the

Legislature intended subsection (j)(2) to apply only to orders or agreements established after the 2014 amendments became effective. There is no sound basis to depart from our reasoning in Landers, as this construction conforms to the Legislature's intent in enacting subsection (j). See L. 2014, c. 42 § 2. Indeed, to hold otherwise would seriously undermine the ability of parties to rely on the otherwise binding agreements entered into under their MSAs based on the law in effect at the time of their entry.

We add that applying subsection (j)(3) rather than subsection (j)(2) requires the court to consider an additional factor not present in subsection (j)(2). Specifically, subsection (j)(3) requires the court to "consider the ability of the obligee to have saved adequately for retirement." N.J.S.A. 2A:34-23(j)(3). In Landers, 444 N.J. Super. at 324, we found that the elevation of this factor was one of the notable distinctions between subsections (j)(1) and (j)(3), revealing the Legislature's intent to treat pre-amendment orders and agreements differently. Accordingly, we conclude that subsection (j)(3), rather than subsection (j)(2), governs the issue of whether plaintiff is entitled to a modification or termination of his alimony obligation.

Because subsection (j)(3) requires consideration of one additional factor, application of only the subsection (j)(2) factors is not an adequate substitute. In

reaching his decision to terminate plaintiff's alimony obligation, the judge explicitly announced that he was relying on subsection (j)(2) and then applied each of the subsection (j)(2) factors. He did not, however, consider whether defendant had adequately saved for retirement. Plaintiff's claim to the contrary relies solely on the judge's consideration of subsection (j)(2)(g), or (j)(3)(g), which focus on "[t]he obligee's level of financial independence and the financial impact of the obligor's retirement upon the obligee." Although factor (g) requires consideration of substantially the same underlying facts, the judge did not explain whether defendant's assets and her plan to continue working for thirteen years demonstrated that she had adequately saved for retirement.

We are also concerned that the judge declined to give weight to the anti-Lepis provision. The parties' MSA provided that the alimony obligation could be reviewed upon a substantial change in circumstances, but the parties agreed that a "voluntary reduction in income of either party" would not constitute a substantial change in circumstances. As we previously noted, defendant does not dispute that plaintiff was medically unable to perform the work required of a chief underground technician. However, plaintiff's own vocational expert opined that he would be capable of working as a security guard or delivering automobile parts. Although these jobs might pay less than his pension payment,

at a minimum, plaintiff could have earned income to supplement his PSE&G pension income in order to meet his alimony obligation. Because plaintiff was still capable of earning income upon his retirement, on remand, the court should consider whether the anti-Lepis provision in the MSA prohibits a reduction of plaintiff's alimony obligation.

Lastly, with respect to defendant's request to compel plaintiff to provide proof that he has maintained the life insurance policy required under the MSA, we conclude that this is not the proper forum to address the matter. The judge's November 27, 2017 order granted defendant's request and provided that if plaintiff did not comply, defendant could "request the [c]ourt on notice to [p]laintiff for the issuance of a bench warrant." If plaintiff has not complied, defendant should seek relief in the family part.

To the extent that we have not addressed the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

The September 25, 2018 order terminating alimony is vacated. The March 20, 2019 order denying reconsideration is reversed. The matter is remanded to the trial judge to determine whether termination or modification of plaintiff's alimony obligation is appropriate under N.J.S.A. 2A:34-23(j)(3), and if so,

21

whether the anti-Lepis provision prohibits a termination or reduction of plaintiff's alimony obligation. In doing so, the trial judge shall also resolve the issue of the missing $1000 pension payment, if possible.

Vacated in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3384-18T3